**WILL NEWMAN LAWYER PLLC**
William H. Newman, Esq.
Tara Q. Higgins, Esq.
33 Nassau Avenue, Second Floor
Brooklyn, New York 11222
Phone: (718) 218-3360
will@willnewmanlawyer.com
tara@willnewmanlawyer.com

*Attorneys for Newton AC/DC Fund L.P., Scallion Trading Ltd., and Stanton Street Capital Partners, Inc.*

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK**<br>In re:<br><br>MULTICHAIN FOUNDATION LTD.,<br><br>       Debtor in a foreign proceeding. | Case No.:  25-12340 (DSJ)<br><br>Chapter:  15 |

### OBJECTION TO MOTION OF FOREIGN REPRESENTATIVES
### TO STAY THE NEWTON PROCEEDINGS

**Table of Authorities**

**Cases**

*Alexander SRP Apartments, LLC v. LSREF2 Baron, LLC (In re Alexander SRP Apartments,
LLC)*, 2012 Bankr. LEXIS 3292 (Bankr. S.D. Ga. June 4, 2012) ...............................................30

*Alexander v. Jensen-Carter (In re Alexander)*, 289 B.R. 711 (8th Cir. BAP 2003) ...............27, 28

*Amer. Film Techs. v. Taritero*, 175 B.R. 847, 850 (Bankr. D. Del. 1994) ....................................27

*Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 650 (2d Cir. 1994)........................................17

*Belsito Commc'ns, Inc. v. Dell, Inc.,*
2013 U.S. Dist. LEXIS 130598, at *16 (S.D.N.Y. Sept. 12, 2013)........................................10

*Burke v. Continental Ins. Co.*, 184 N.Y. 77, 82 (1902) ................................................................17

*Butner v. United States,* 440 U.S. 48, 55 (1979) ..........................................................................18

*Cassirer v. Herskowitz (In re Schick),* 234 B.R. 337 (Bankr. S.D.N.Y. 1999) ........................20, 21

*Feld v. Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995)...................................................................26

*Foulke v. N.Y. C. R. Co.*, 228 N.Y. 269, 275 (N.Y. 1920) ............................................................17

*In re Aguila, Inc.*, 2022 Bankr. LEXIS 2384 (Bankr. S.D.N.Y. Aug. 30, 2022) ............................9

*In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175 (Bankr. S.D.N.Y. 2022) ......................28

*In re Applin,* 108 B.R. 253 (Bankr. E.D. Cal. 1989) .....................................................................21

*In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009).............................................25, 26

*In re Avanti Comms. Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018)........................................25

*In re Celsius Network LLC*, 647 B.R. 631, (Bankr. S.D.N.Y. 2023) ................................10, 12, 18

*In re Energy Coal S.P.A.*, 582 B.R. 619 (Bankr. D. Del. 2018).....................................................28

*In re Foodservicewarehouse.com, LLC*, 601 B.R. 396, 411 (E.D. La. 2019) ..........................26, 27

*In re Fuel Oil Supply & Terminaling, Inc.*,
1987 U.S. Dist. LEXIS 1320 (S.D. Tex. Jan. 29, 1987)........................................................17

*In re Phila. Newspapers, LLC*, 407 B.R. 606 (E.D. Penn. 2009)...................................................27

*In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir. 1990)...............................30, 31, 32, 33

*In re Voyager Digital Holdings, Inc.*,
2022 Bankr. LEXIS 2178 (Bankr. S.D.N.Y. Aug. 5, 2022)....................................................18

*Mays v. N.Y., N. H. & H. R. Co.*,
97 N.Y.S.2d 909, 1063-64 (N.Y. App. Term 1st Dep't 1950) ................................................16

*Maywalt v. Parker & Parsley Petroleum Co.,* 155 F.R.D. 494 (S.D.N.Y. 1994) .........................24

*Meghji v. Falba (In re Celsius Network LLC),*
2025 Bankr. LEXIS 1867 (Bankr. S.D.N.Y. Aug. 5, 2025)...................................................11

*Merrill Lynch Mortg. Capital, Inc. v. FDIC,* 293 F. Supp. 2d 98, 107 (D.D.C. 2003) ................17

*Nat'l Corp. for Housing Partnership v. Liberty Bank, 836 F.2d 433, 436* (8th Cir. 1988)...........17

*Nevada Power Co. v. Calpine Corp.*, 365 B.R. 401 (S.D.N.Y. 2007) ......................................27, 28

*Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.),*
2009 Bankr. LEXIS 1815 (Bankr. D. Del. July 9, 2009) ...........................................18, 19, 20

*Risley v. Universal Navigation Inc.*,
2025 U.S. App. LEXIS 4460, *6-7 (2d Cir. Feb. 26, 2025)...............................................14, 15

*Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of
Rockville Ctr.)*, 651 B.R. 622 (Bankr. S.D.N.Y. 2023) ..........................................................29

*Slainte Invs. L.P. v. Jeffrey,* 142 F. Supp. 3d 239, 249 (D. Conn. 2015) ....................................10

*Sonnax*, 907 F.2d at 1286 ............................................................................................................32

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),*
764 F.3d 512 (5th Cir. 2014) .............................................................................................10, 22

*Victrix S.S. Co., S.A. v. Salen Dry Cargo*, A.B., 825 F.2d 709 (2d Cir. 1987)..............................28

*W.R. Grace & Co. v. Chakarian*, 2004 Bankr. LEXIS 579, at *9-10 (Bankr. D. Del. 2004) .......27

**Statutes**

11 U.S.C. § 105(a) ...........................................................................................................26

11 U.S.C. § 1520(a)(1) .....................................................................................................10

11 U.S.C. § 1521(a)(1) .....................................................................................................23

11 U.S.C. § 1521(a)(7) .....................................................................................................32

11 U.S.C. § 362(a)(3) .......................................................................................................10

11 U.S.C. § 541(b)(1) .......................................................................................................16

**Rules**

Federal Bankruptcy Rule 9014 ...........................................................................................9

Fed. R. Evid R. 802-04 ....................................................................................................23

Fed. R. Evid. 1101 ...........................................................................................................23

**Table of Contents**

Preliminary Statement ................................................................................................................1

Factual Background.....................................................................................................................2

    I.     Cryptocurrencies Are Recorded and Transmitted on Blockchains ..................................2

    II.    Multichain Enables Users to Move Tokens Across Blockchains......................................3

    III.   Multichain Established Terms for Its Service and Disclaimed Ownership Over
         Liquidity Pool Assets.....................................................................................................4

        A.    Multichain Made Promises to Users on How Its System Worked .............................4

        B.    Multichain Expressly Disclaimed Ownership over Liquidity Pool Assets ................4

        C.    Multichain Did Have Custody Over Other Assets .....................................................5

    IV.   Circle Issues USDC Stablecoins, Which Are Meant to be U.S. Dollar
         Equivalents ....................................................................................................................6

    V.    Circle Does Not Issue USDC on the Fantom and Moonriver Blockchains, but
         Multichain's Infrastructure Enabled Proxies on Both ..................................................7

    VI.   Thieves Stole Over $63 Million Worth of USDC ...........................................................8

    VII.  Circle Blacklisted the Stolen USDC...............................................................................8

    VIII. The Named Plaintiffs Own multiUSDC...........................................................................8

    IX.   Fantom Foundation Sued Multichain, Prompting Appointment of the
         Liquidators.....................................................................................................................9

Request for Evidentiary Hearing ................................................................................................9

Argument.....................................................................................................................................9

    I.     The Court Should Deny the Stay Pursuant to Section 1520 Because Multichain
         Has No Interest in the Subject of the Class Action, the $63 Million Circle Holds ..........9

        A.    Multichain Expressly Agreed It Did Not Hold the Stolen USDC............................10

            1.    The Singapore Court Held the Multichain Website Constituted a User
                Agreement, and New York Law is Consistent With This Holding.................10

            2.    The Terms of the User Agreement State that Multichain Did Not Own
                the Stolen USDC .........................................................................................11

            3.    The Liquidators Cannot Escape the Clear Language of the User
                Agreement ...................................................................................................12

        B.    Even If There Were No Agreement, Multichain Did Not Own the Stolen
          USDC.......................................................................................................................13

            1.    Multichain Merely Provided a Forum For Tokenholders to Purchase
                 the Stolen USDC .........................................................................................14

            2.    If Multichain Did Have Custody Over the Stolen USDC, It Was as a
                Bailee.........................................................................................................16

               a.  An Express Bailment Existed.................................................................16

|  |  | b. | An Implied Bailment Existed ................................................17 |
|  | 3. | | The Liquidators' Arguments Do Not Support the Claim Multichain Owned the Stolen USDC ...................................................18 |
|  |  | a. | The Liquidators Are Wrong that the Absence of an Agreement Means It Held an Interest in the Stolen USDC.........................18 |
|  |  | b. | Multichain Did Not Control Any Commingled Assets ............18 |
|  |  | c. | The Anonymous Tweet Is Not Evidence Multichain Held the Stolen USDC .........................................................20 |
|  |  | d. | The Liquidators' Expert Offers Nothing to Suggest Multichain Owned the Stolen USDC...............................................22 |

II. A Discretionary Stay Pursuant to Section 1521 or Section 105 is Not Appropriate Here ...............................................................23

    A. Section 1521 Relief is Not Appropriate Since the Class Action Does Not Concern the Debtor's Assets, Rights, Obligations or Liabilities.............................23

    B. Section 1521 Relief is Not Necessary to Ensure Equal Treatment of Multichain's Creditors................................................24

    C. The Liquidators Fail to Cite Authority Supporting Section 1521 Relief .................25

    D. Section 1521 Relief is Not Appropriate Since It Would Not Sufficiently Protect Multi USDC Tokenholders ........................................26

    E. The Liquidators Have Not Established "Unusual Circumstances" to Warrant an Injunction Pursuant to Section 105 .....................................26

III. The Liquidators Fail to Meet the Requirements for Injunctive Relief ...........................29

    A. A Stay Will Not Prevent Irreparable Harm ...............................................29

    B. The Balance of the Equities is Neutral Here ............................................29

    C. The Public Interest Weighs In Favor of the Tokenholders......................................30

IV. Even if the Stay Applies, the Court Should Grant Relief From the Stay ......................30

Conclusion .........................................................................33

Newton AC/DC Fund, L.P., Scallion Trading Ltd., and Stanton Street Capital Partners, Inc. (collectively, the "Named Plaintiffs"), on behalf of a proposed class of holders of multiUSDC cryptocurrency, respectfully submit this memorandum of law in opposition to the Motion of Foreign Representatives (the "Liquidators") to Stay the Newton Proceedings, dated February 17, 2026 (ECF No. 27, the "Motion"). This motion is supported by the declarations of Tara Q. Higgins, dated March 10, 2026 (the "Higgins Decl."), of James Miller, dated March 9, 2026 (the "Miller Decl."), and of Eric S. Meyer, dated October 27, 2025 (the "Meyer Decl.," ECF No. 15).

**Preliminary Statement**

1. The Liquidators seek to stay a class action lawsuit that does not involve the debtor's assets. The debtor is not a party to the lawsuit. The debtor repeatedly stated that it never possessed the relevant assets. And the Liquidators fail to present law or evidence to support the claim the debtor has any legal interest in the case. This opposition sets forth how the Liquidators are wrong on the facts and why an evidentiary hearing may provide a more helpful explanation.

2. This dispute concerns a type of cryptocurrency called a "stablecoin" that was used in a service called a "cross-chain bridge." Put simply, a stablecoin is a cryptocurrency that people can use in online transactions as if it were U.S. currency because the issuer guarantees each unit can be redeemed for a dollar. And a cross-chain bridge is a service that lets people engage in transactions across different cryptocurrency systems by allowing users to deposit tokens in one system and receive a "wrapped" version of that token in another system that can be redeemed for the original token on the first system.

3. After hackers stole over $120 million worth of assets from the debtor's cross-chain bridge, people who held "wrapped" tokens could no longer redeem their cryptocurrency. For many, there was no real recourse. But for holders of a wrapped stablecoin, the underlying asset— U.S. dollars—were safe in a corporate bank account. As a result, holders of wrapped stablecoins

commenced a class action lawsuit against the corporation that had issued the stablecoins, seeking a constructive trust over the money. The Liquidators seek to stay that suit based on the incorrect belief that the debtor owned the stablecoins.

4. The Liquidators' argument fails because the debtor never owned the assets at issue in the class action. This opposition explains how the debtor developed a system that, by design, conferred ownership and control over the relevant assets to the holders of wrapped tokens, including stablecoins. The Liquidators' motion glosses over the debtor's role in the class action's claims and repeatedly, but baselessly, asserts the debtor's ownership of the stolen assets. But those assets were never the debtor's property, and so the Liquidators are not the proper parties to marshal or distribute them. Instead, the people who bought and sold U.S. dollars in wrapped token format are the true owners who should be permitted to seek relief directly.

## **Factual Background**

I. Cryptocurrencies Are Recorded and Transmitted on Blockchains

5. Cryptocurrencies are assets that people can own and transmit to others. Miller Decl. ¶ 6. An individual unit of a cryptocurrency is often called a token, and there are thousands of different kinds of tokens. *Id.* ¶ 7. Decentralized computing infrastructure cryptographically verifies and immutably records on a "blockchain" every transaction which creates, destroys or transfers a token. *Id.* ¶ 8.

6. A blockchain is a decentralized and immutable ledger maintained by many participating computing nodes called validators or miners. *Id.* ¶ 9.

7. Ownership of cryptocurrencies is established by demonstrating the possession of a private key, which is uniquely associated with a public address (also known as a "wallet"), which is analogous to a bank account number. *Id.* ¶ 10.

2

8.      Traditionally, a blockchain with all its associated tokens functions as an independent and isolated system of recording financial transactions.  *Id.* ¶ 11.  However, as there are hundreds of different blockchains, people have developed mechanisms for safely and securely transferring cryptocurrency between blockchains.  *Id.*

II.     <u>Multichain Enables Users to Move Tokens Across Blockchains</u>

9.      Multichain Foundation Ltd. ("Multichain") created a cross-chain bridge that enables users to transfer tokens between blockchains.  *Id.* ¶ 12.  That is, the bridge (the "Bridge") permitted a token whose issuance and transfers were validated and recorded on one blockchain to be effectively ported or bridged, via creation of an economically equivalent proxy token, to a different blockchain where it could be utilized in a similar fashion.  *Id.*  The Bridge was originally called Anyswap, but Multichain later renamed it Multichain.  *Id.*

10.     The Bridge accomplished this goal by requiring users to deposit the asset that they wanted to bridge into a particular wallet which functioned as a "liquidity pool" on the first blockchain.  *Id.* ¶ 13.

11.     Once a user transferred an asset to that liquidity pool, the external Multichain infrastructure triggered software (called a "smart contract") on the destination blockchain to issue an equivalent amount of new, proxy tokens, or wrapped tokens, to that user's address on the second blockchain.  *Id.* ¶ 14.  The user could then use the wrapped token on the second blockchain in the same manner as the original asset was used on the first blockchain.  *Id.*  As long as everything was working properly, a user could, at any time, reverse the process by depositing the wrapped tokens back to the smart contract on the second blockchain.  *Id.*  The re-deposit extinguished the wrapped tokens and triggered the smart contract on the first blockchain to release an equivalent amount of the underlying asset to the user's corresponding address from the liquidity pool.  *Id.*

3

12.     Because wrapped tokens can be exchanged for an equivalent amount of underlying assets, the value of each wrapped token remains stable at the same value as the underlying asset. *Id.* ¶ 15.

III.    Multichain Established Terms for Its Service and Disclaimed Ownership Over Liquidity Pool Assets

A.      Multichain Made Promises to Users on How Its System Worked

13.     Multichain expressly promised users that they could redeem wrapped tokens for assets in its liquidity pool.  It did so pursuant to an agreement on its website.

14.     On its website, Multichain stated that in the "Redeeming" process, "the wrapped asset [is] burned and then the asset in smart contract [is] released back to the chain from where it originally came."  Higgins Decl., Ex. 1.  This means that users can exchange wrapped tokens for the corresponding underlying assets in the liquidity pool.  *See* Miller Decl. ¶ 17.

15.     The Multichain website referred to MPC nodes, which are a group of independent systems that can work collectively.  Multichain wrote that when "assets are redeemed, the Wrapped Asset smart contract is triggered by the MPC nodes to burn the tokens.  The MPC nodes then release the assets from the Decentralized Management Account and send them to the user on the origin chain."  Higgins Decl., Ex. 2.  This also means that users can exchange wrapped tokens for corresponding underlying assets in the liquidity pool.  Miller Decl. ¶ 17.  On the same page, Multichain stated that in redemption, the wrapped tokens "are burned[,] and then the SMPC nodes release [liquidity pool assets] on the origin chain."  Higgins Decl., Ex. 2.  This means that users receive liquidity pool assets once they redeem wrapped tokens.  Miller Decl. ¶ 18.

B.      Multichain Expressly Disclaimed Ownership over Liquidity Pool Assets

16.     Multichain promised users that it had deliberately developed infrastructure to avoid having custody of, let alone ownership of, liquidity pool assets.  *Id.* ¶¶ 19-22.  By doing so, it

4

sought to remove the type of security risk that had allowed a hack of a competing cross-chain bridge in June 2022.  Meyer Decl. ¶ 15.

17.     On its website, Multichain described its system as "Non-custodial."  Higgins Decl., Ex. 3.  Non-custodial in this context refers to Multichain's design to prevent it from having custody over user assets.  *See* Miller Decl. ¶ 19.

18.     To avoid custody over user assets, the Bridge was a "decentralized" system.  Miller Decl. ¶ 19.  Instead of giving itself the key to any of its liquidity pools, Multichain developed a system in which no one held the key.  *See* Higgins Decl., Ex. 4 ("The complete key is never assembled…").  It used an algorithm called the TSS Distributed Key Generation Algorithm (the "Algorithm").  *Id.*  The Algorithm split portions of the key among numerous MPC nodes, and some combination of those nodes could use the Algorithm to generate a key that can be used for a particular transaction.  *Id.*  In promoting the system, Multichain promised that assets users deposited were "held securely" in an "address … only controlled by [a decentralized system no one controls] and not by human or any other [individual person or entity]."  Higgins Decl., Ex. 2.  Rather than a centralized system it controlled, Multichain promised a system governed by nodes that are:

> … run by different organisations, institutions and individuals, which independently run Multichain's protocol.  The end result is a decentralized and trustless service.

Higgins Decl., Ex. 4.

C.     <u>Multichain Did Have Custody Over Other Assets</u>

19.     In contrast to its liquidity pools, Multichain publicly acknowledged holding other assets.  Miller Decl. ¶ 31.  It held public wallets holding operational and investor funds.  *Id.*  And it maintained a distinct fund to compensate users in the event of a security incident.  *Id.*

5

IV.     Circle Issues USDC Stablecoins, Which Are Meant to be U.S. Dollar Equivalents

20.     Many people want to conduct transactions that are recorded on blockchains, but in U.S. dollars instead of in volatile cryptocurrency.  To enable this, some companies have issued stablecoins. *See id.* ¶¶ 23-24.  These are cryptocurrencies that are meant to represent government-issued fiat currency, such as dollars, pounds, or euros. *See id.*

21.     Circle Internet Financial LLC and Circle Internet Group, Inc. (collectively, "Circle") issue a stablecoin called USDC.  Meyer Decl. ¶ 2-3.  The value of each USDC token is maintained close to $1 each by Circle's promise to its registered clients to exchange 1 USDC for 1 U.S. dollar on demand at any time. *Id.*  As USDC is essentially an on-demand, senior obligation of Circle, USDC functions effectively as the analog of a bank deposit, with Circle in the role of the bank. *Id.*  Accordingly, the value of one USDC token remains stable at approximately one U.S. dollar because any deviation would allow arbitrage by Circle's registered customers. *Id.*

22.     To meet this obligation, Circle holds a large reserve of highly liquid U.S. dollar-denominated assets at New York–based financial institutions, including BlackRock and Bank of New York Mellon (the "Circle Treasury").  Meyer Decl. ¶ 3.  Circle markets USDC as a reliable product.  On its website, it touts that "USDC is a regulated, digital currency that can always be redeemed 1:1 for U.S. dollars." *Id.*

23.     Circle knows the cryptocurrency industry is rife with fraud.  Accordingly, Circle developed the technological ability to render its tokens untransferable in the event of fraud. *See* Higgins Decl., Ex. 6.  When it applies this power, called "blacklisting," to a particular address, that address is prevented from transferring any USDC tokens that it holds. *See id.*, Ex. 7. Accordingly, USDC tokens held in a wallet at a blacklisted address can also not be exchanged by Circle for dollars. *See id.*  This process makes the USDC tokens in a blacklisted wallet essentially worthless. *See id.*  This process also creates a windfall for Circle, since it stops being obliged to

6

pay funds from the Circle Treasury to redeem USDC tokens from a blacklisted wallet. *See id.* Those funds are thus free for Circle to keep for itself or use elsewhere.

V.   Circle Does Not Issue USDC on the Fantom and Moonriver Blockchains, but Multichain's Infrastructure Enabled Proxies on Both

24.   Ethereum is a popular blockchain. Meyer Decl. ¶ 2. Many different cryptocurrencies use it to record their transactions.

25.   Circle issues USDC natively on several different blockchains. *Id.* The subject matter of the Named Plaintiffs' claims, however, exclusively concerns USDC issued by Circle on the Ethereum blockchain, and so all references to USDC or Circle's actions relate to the Ethereum blockchain.

26.   Fantom and Moonriver are two other blockchains. *Id.* Circle did not issue USDC on these blockchains, however, despite there being market demand for a U.S. dollar–tied cryptocurrency to trade on them. *Id.* ¶ 5.

27.   Multichain's infrastructure allowed users to perform transactions with a proxy for USDC on the Fantom blockchain and a proxy for USDC on the Moonriver blockchain, among others. *Id.* Multichain did this by allowing users to contribute USDC to liquidity pools on Ethereum (collectively, the "Liquidity Pool"). *Id.* In turn, Multichain issued a wrapped version of USDC ("multiUSDC") on the Fantom and Moonriver blockchains. *Id.*

28.   The value of a multiUSDC token was designed to approximate the value of a USDC token using a mechanism similar to Circle's exchange option. *Id.* ¶ 5-7. Users could, for example, conduct transactions with multiUSDC on the Fantom blockchain as if those tokens were USDC because the Multichain infrastructure allowed users to exchange multiUSDC for native USDC on the Ethereum blockchain, which in turn could be exchanged for U.S. dollars with Circle. *Id.*

7

VI.    Thieves Stole Over $63 Million Worth of USDC

29.    At least one anonymous person hacked the Liquidity Pool in July 2023 (the "Hack") and stole $125 million worth of cryptocurrency assets, including $63,289,029 worth of USDC (the "Stolen USDC"). *Id* . ¶¶ 6-7.

30.    The effect of the theft of the Stolen USDC was to render multiUSDC effectively worthless because it could no longer be redeemed for USDC. *Id.* ¶ 7.

VII.    Circle Blacklisted the Stolen USDC

31.    Shortly after the Hack, Circle blacklisted the addresses that now hold the Stolen USDC.  The effect of an address being blacklisted is that the USDC held in that address becomes untransferable.  As a result, Circle trapped over 63 million USDC indefinitely.

VIII.    The Named Plaintiffs Own multiUSDC

32.    The Named Plaintiffs together hold about 4.6 million multiUSDC tokens.  Motion, Ex. D ¶¶ 45-47.

33.    The Named Plaintiffs commenced a lawsuit (the "Class Action") to seek relief for a class of all holders of multiUSDC on the Fantom and Moonriver blockchains (the "Tokenholders").  *Id.* ¶ 51.  At least hundreds of people and entities hold multiUSDC tokens on those blockchains.  *Id.* ¶ 53.

34.    The Class Action complaint does not allege that the Tokenholders are creditors of Multichain or of Circle.  Instead, the Class Action complaint alleges that, without equitable relief, Circle will enjoy unjust enrichment by blacklisting $63 million of funds in the Circle Treasury. *Id.* ¶¶ 62-63.  It asserts that the Tokenholders are the equitable owners of those funds because, by owning multiUSDC, they are the beneficial owners of the Stolen USDC and, as beneficial owners of the Stolen USDC, they are the beneficial owners of the $63 million.  *Id.*

8

IX.    Fantom Foundation Sued Multichain, Prompting Appointment of the Liquidators

35.    Following the Hack, Fantom Foundation Ltd. ("Fantom Foundation"), the organization that operated the Fantom blockchain, sued Multichain in the General Division of the High Court of the Republic of Singapore (the "Singapore Court"). In an order dated July 8, 2024 (Higgins Decl. Ex. 5, the "Singapore Order"), the Singapore Court held that Multichain's statements on its website constituted a "User Agreement" that "comprises the terms and conditions for the use of" the Bridge. Singapore Order ¶ 12. Fantom Foundation's principal claims were for negligence and fraud. *Id.* ¶ 17. The Singapore Court awarded damages to Fantom Foundation. *Id.* ¶¶ 27, 34, 50.

36.    Following Multichain's failure to satisfy the Singapore Order, the Singapore Court appointed the Liquidators to marshal Multichain's assets to satisfy its creditors. Motion ¶ 1.

## Request for Evidentiary Hearing

37.    The advisory committee notes to Federal Bankruptcy Rule 9014 indicate that "if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held…" *In re Aguila, Inc.*, 2022 Bankr. LEXIS 2384, at *12 (Bankr. S.D.N.Y. Aug. 30, 2022) (quoting advisory committee's note to 2002 amendment to Fed. R. Bankr. P. 9014).

38.    A dispute of material facts exists between the parties, principally concerning how the Liquidity Pool operated and the degree to which Multichain controlled it. As such, the Named Plaintiffs respectfully request the Court hold an evidentiary hearing to resolve the factual disputes.

## Argument

I.    The Court Should Deny the Stay Pursuant to Section 1520 Because Multichain Has No Interest in the Subject of the Class Action, the $63 Million Circle Holds

39.    The automatic stay does not apply to the Class Action since, pursuant to the applicable statutory provision, the stay only applies to "any act to obtain possession of property of

9

the estate or of property from the estate or to exercise control over property of the estate."  11

U.S.C. § 362(a)(3); *see also* 11 U.S.C. § 1520(a)(1) (making the automatic stay provision

applicable to Chapter 15 Proceedings).

40.     It is the Liquidators' burden to establish that the subject of the Class Action is

Multichain's property.  This is because, "[t]he party seeking to include property in the estate bears

the burden of showing that the item is property of the estate."  *TMT Procurement Corp. v. Vantage*

*Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 (5th Cir. 2014).  Here, the

Liquidators fail to meet that burden.

A.     Multichain Expressly Agreed It Did Not Hold the Stolen USDC

41.     Multichain promised users that it had deliberately developed infrastructure

specifically to avoid having custody of, let alone ownership of, the Stolen USDC.  The Liquidators

therefore cannot claim Multichain owns the exact assets it purposefully avoided.

1.     The Singapore Court Held the Multichain Website Constituted a User
Agreement, and New York Law is Consistent With This Holding

42.     The same Singapore Court that appointed the Liquidators determined that the terms

on the Multichain website constituted a user agreement.  *See* Singapore Order ¶¶ 12, 17, 22.  The

Liquidators cannot rely on the Singapore Court for the validity of their appointment while

distancing themselves from its holding on a key issue.

43.     Additionally, it is settled law that promotional materials can constitute an

agreement between the offeror of services and users.  *See, e.g., Belsito Commc'ns, Inc. v. Dell,*

*Inc.,* 2013 U.S. Dist. LEXIS 130598, at *16 (S.D.N.Y. Sept. 12, 2013)*; Slainte Invs. L.P. v. Jeffrey,*

142 F. Supp. 3d 239, 249 (D. Conn. 2015).  And the Court in *In re Celsius Network LLC* examined

terms of use to determine whether users or the operator of a cryptocurrency exchange owned

cryptocurrency assets.  647 B.R. 631, 640 (Bankr. S.D.N.Y. 2023).

10

2. The Terms of the User Agreement State that Multichain Did Not Own the Stolen USDC

44. Here, Multichain expressly agreed not to take custody of the Stolen USDC. It describes its system as "Non-custodial" on its website. Higgins Decl., Ex. 3. Non-custodial in this context refers to Multichain's design to prevent itself from having "custody" over user assets. *See* Miller Decl. ¶ 19.

45. To avoid custody over user assets, the Bridge was a "decentralized" system. Neither Multichain nor any other single entity could control the Liquidity Pool or the assets within it. Typically, the entity that holds the key to a cryptocurrency wallet has control over the wallet since the key can be used to authorize transactions. *See, e.g., Meghji v. Falba (In re Celsius Network LLC),* 2025 Bankr. LEXIS 1867, *50 (Bankr. S.D.N.Y. Aug. 5, 2025) (noting debtor's lack of key to a cryptocurrency wallet meant that it did not control the assets therein).

46. Instead of giving itself the key to the Liquidity Pool, Multichain developed a system in which no one held the key. *See* Higgins Decl., Ex. 4 ("The complete key is never assembled…"). It used an Algorithm that split portions of the key among numerous entities, each called a "node," and some combination of those nodes could use the Algorithm to generate a key for a particular transaction. *Id.* In promoting the Bridge, Multichain promised that the Stolen USDC was "held securely" in an "address … only controlled by [a decentralized system no one controls] and not by human or any other [individual person or entity]." Higgins Decl., Ex. 2. Rather than a centralized system it controlled, Multichain promised a system governed:

> … by different organisations, institutions and individuals, which independently run Multichain's protocol. The end result is a decentralized and trustless service.

Higgins Decl., Ex. 4.

11

47.     Pursuant to these promises that users retained ownership and were not conveying title to Multichain, users deposited USDC tokens in the Liquidity Pool. And pursuant to the rule set forth in *Celsius*, those terms mean the assets are not Multichain's property. 647 B.R. at 640.

### 3.     The Liquidators Cannot Escape the Clear Language of the User Agreement

48.     The Liquidators' four responses cannot escape this clear language.

49.     First, the Liquidators claim Multichain's promises arise only in "cherry-picked statements." Motion ¶ 65. But the Liquidators fail to identify a single statement that provides a fuller context that contradicts the promises cited above. Nor can they, since Multichain's promise of a trustless service was a central feature of its service. Miller Decl. ¶ 22.

50.     Second, the Liquidators claim that, while Multichain's statements discuss "how the Multichain Bridge Software functioned," they are silent about "ownership of the USDC." Motion ¶ 66. The claim is not true; Multichain expressly said its system was "non-custodial," which means it did not take custody of assets. *See* Higgins Decl., Ex. 3. Moreover, Multichain's explanation of how the system worked is directly related to the ownership of the assets users transmit through it. Specifically, Multichain's explanation, that users provide their assets to a Liquidity Pool that no one central entity controls, notifies users that Multichain does not own or control their assets.

51.     Third, the Liquidators argue the Court should disregard Multichain's promises if Multichain breached them in practice. This argument fails for three reasons. First, as the Liquidators observe in their own papers, the agreement controls. *See* Motion ¶ 60 (citing *Celsius*, 647 B.R. at 640). If the only relevant criterion for ownership were what Multichain did in practice, then the agreement would be meaningless. Second, to disregard the promises because of Multichain's breach would be inequitable. This would reward a dishonest party at the expense of those who reasonably relied upon an agreement. And third, as explained in Section I.B.3, *infra* at

12

18-23, the Liquidators have no evidence to support their speculation that Multichain's system was secretly organized differently than advertised.

52. And fourth, the Liquidators speculate that the Named Plaintiffs in the Class Action did not rely on the contract terms. *See* Motion ¶¶ 70-71. This argument fails for five reasons. First, the Named Plaintiffs' reliance on any agreement is irrelevant to whether an agreement existed between the users who deposited the Stolen USDC and Multichain about who owned the Stolen USDC. The Liquidators cite nothing that relieves Multichain from its promise made to depositors that multiUSDC holders alone would own the Stolen USDC. Second, the Class Action is a proposed class action, so any speculation about the Named Plaintiffs is irrelevant if it is not true about the class generally. Third, the Liquidators cite nothing to support their speculation about when the Named Plaintiffs acquired multiUSDC. Fourth, reliance is an element of a fraud claim, which is not one of the claims the class asserts in the Newton Action. And fifth, the argument misunderstands the purpose of wrapped tokens, which are designed to be traded to other people so that those people can claim underlying assets held in the Liquidity Pool. Miller Decl. ¶¶ 17-18. And so even if the Named Plaintiffs did not themselves deposit the Stolen USDC in the Liquidity Pool, they acquired the right to collect it.

B. Even If There Were No Agreement, Multichain Did Not Own the Stolen USDC

53. Even if Multichain's representations did not themselves settle the issue of whether Multichain owns the Stolen USDC, Multichain never actually held or owned the Stolen USDC. It merely developed the Bridge through which USDC was deposited and multiUSDC was issued. *Id.* ¶ 23. The anonymous social media message upon which the Liquidators rely does not say otherwise. An evidentiary hearing may more clearly present the relevant facts.

    1.      <u>Multichain Merely Provided a Forum For Tokenholders to Purchase the
Stolen USDC</u>

54. In a deliberate effort to evade a cyberattack, Multichain designed the Bridge to avoid its control over the cryptocurrency users transmitted. In practice, this meant that no one entity controlled the Liquidity Pool. And so, if Multichain could not withdraw assets from the Liquidity Pool, as an entity with control over assets can do. Instead, only the widely distributed nodes could authorize a transaction. Blockchain records reflect that the nodes authorized transactions many times. *Id*. ¶ 29. No evidence exists that Multichain ever unilaterally took action with the Liquidity Pool. *Id.* This makes sense since it could not do so.

55. Without the ability to authorize transactions in the Liquidity Pool or withdraw assets from it, Multichain never possessed the Stolen USDC.

56. This structure is not unique; the Second Circuit recognized that the operator of a similar liquidity pool did not own its tokens in *Risley v. Universal Navigation Inc*., 2025 U.S. App. LEXIS 4460, *6-7 (2d Cir. Feb. 26, 2025). In *Risley*, the defendant company operated a cryptocurrency trading platform using smart contracts in a manner similar to the Bridge. *Id.* at *3-4. In applying federal securities law, the Second Circuit noted that as host of the platform, the defendant does not "hold title to the tokens placed in the liquidity pool by third party users of the platform." *Id.* at *6. Instead, it is the parties that deposit tokens in the pool "who retain title of their tokens through pool tokens that may be turned in at any time of their choosing to recover the value of their originally-deposited tokens that created the trading pool." *Id.* at *6-7.

57. None of the three grounds Liquidators offer to distinguish the *Risley* case addresses the reasoning for its decision. First, the Liquidators argue that the liquidity pool in *Risley* was decentralized, while they contend Multichain "controll[ed] the servers that hosted the MPC Nodes and … the Multichain Bridge Software, [and therefore] the power to transfer any assets deposited

14

into the Multichain Bridge Software." Motion ¶ 68. The Liquidators misstate the facts: Multichain expressly advertised itself as "decentralized" and disclaimed control over the nodes. *See* Section I.A.2, *supra* at 11 (citing Higgins Decl. Exs. 2-4). An expert analysis confirms the Liquidators lacked this control. *See* Miller Decl. ¶¶ 19-22. The Liquidators cite no expert analysis to the contrary. *See infra* ¶¶ 60-61. The anonymous social media post they cite also fails to support the claim. *See* Section II.B.3.c, *infra* at 20-22.

58. Second, the Liquidators note that the Bridge in *Risley* allowed third parties to create liquidity pools, whereas Multichain created the Liquidity Pool at issue here. As the Liquidators acknowledge in their motion, however, the "core" fact supporting the court's decision the debtor did not own the liquidity pool assets was that they were "decentralized and not under the control of the Bridge host or any other party." Motion ¶ 68. The court did not cite the identity of the creator of the pool as a relevant factor in who owned the assets in it.

59. And third, the Liquidators assert that the Bridge in *Risley* facilitated trades among third parties while the Liquidity Pool only enabled trades between Multichain and tokenholders. Motion ¶ 69. This argument assumes its own conclusion and cites nothing in support. It is wrong because, like the liquidity pool in *Risley*, the Liquidity Pool did not enable any transaction involving Multichain. Instead, it merely enabled users to deposit and withdraw USDC. *See* Miller Decl. ¶ 32.

60. The Liquidators' expert does not cite any evidence to the contrary. Instead, he observes that someone could access the Liquidity Pool without the nodes' permission if that person had the key. ECF No. 28 at ¶¶ 8-9. Nothing besides speculation suggests that any one person had the key, let alone Multichain. Moreover, the expert's observation is not unique to Multichain; indeed, anyone with the right key could control someone else's cryptocurrency wallet, the same

15

way anyone with the right key could enter someone's home or car, or anyone with the right password could log into a computer. The possibility that someone could forge a key or steal a password does not negate the ownership that arises from legitimately holding a key or password.

61.     Ultimately, James Miller explains how Multichain never held custody over the Stolen USDC. Miller Decl. ¶¶ 25-33. The Liquidators' expert opinion does not explain otherwise. To the extent the Court seeks further guidance on these issues, however, an evidentiary hearing may be helpful.

## 2.     If Multichain Did Have Custody Over the Stolen USDC, It Was as a Bailee

62.     Even if Multichain had possession of the Stolen USDC, which it did not, its tenuous relationship to those assets is insufficient for the automatic stay to apply. This is because 11 U.S.C. § 541(b)(1) excludes from the definition of property of the estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." And so even if Multichain had any possession or control over the Stolen USDC, it could only exercise it for the benefit of Tokenholders.

### a.     An Express Bailment Existed

63.     To the extent Multichain ever had custody of the USDC, it did so as a bailee without obtaining title. In New York:

> A bailment is defined as a delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be.

*Mays v. N.Y., N. H. & H. R. Co.*, 97 N.Y.S.2d 909, 1063-64 (N.Y. App. Term 1st Dep't 1950).

64.     Those elements are met here. Depositors delivered the Stolen USDC to the Liquidity Pool on the Ethereum blockchain as a deposit so that they could conduct transactions on the Fantom and Moonriver blockchains with multiUSDC tokens they received to reflect their

16

deposit.  *See* Miller Decl. ¶ 14.  They did so pursuant to an agreement set forth on the Multichain website that the Liquidity Pool would redeliver the tokens on demand to the holder of multiUSDC tokens.  *See* Higgins Decl. Ex. 2.  At no time was Multichain entitled to spend the money on its own account; the express agreement always required the Liquidity Pool to hold the tokens in bailment for multiUSDC holders to reclaim later.

65.     It is well-settled law that a bailee does not take title to property it holds on behalf of another.  *See Burke v. Continental Ins. Co.*, 184 N.Y. 77, 82 (1902).  And certificates reflecting an interest in other property can be the subject of a bailment.  *See Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 650 (2d Cir. 1994) (deciding that "holding certificates" in platinum were the subject of a bailment).  Fungible goods may also be the subject of a bailment.  *See, e.g., Merrill Lynch Mortg. Capital, Inc. v. FDIC,* 293 F. Supp. 2d 98, 107 (D.D.C. 2003) (citing *Nat'l Corp. for Housing Partnership v. Liberty Bank, 836 F.2d 433, 436* (8th Cir. 1988)); *In re Fuel Oil Supply & Terminaling, Inc*., 1987 U.S. Dist. LEXIS 1320, at *10 (S.D. Tex. Jan. 29, 1987).

66.     Accordingly, as holders of multiUSDC, the Tokenholders hold title to the USDC deposited into and then stolen from the Liquidity Pool.

       b.     <u>An Implied Bailment Existed</u>

67.     Even if the agreement on the Multichain website did not constitute an express agreement, an implied bailment existed.  An implied bailment exists when a defendant lawfully possesses property with a "duty to account for the thing as the property of another." *Foulke v. N.Y. C. R. Co*., 228 N.Y. 269, 275 (N.Y. 1920).

68.     Here, even if Multichain possessed the Stolen USDC, it only held that property with a duty to return it to multiUSDC holders.  *See* Higgins Decl. Ex. 2.  It observed that duty, never withdrawing any of the property from the Liquidity Pool.  *See* Miller Decl. ¶ 32.  Accordingly, to the extent it possessed the Stolen USDC, it was a bailee who did not take title.

17

3.    The Liquidators' Arguments Do Not Support the Claim Multichain Owned the
Stolen USDC

a.    The Liquidators Are Wrong that the Absence of an Agreement Means It
Held an Interest in the Stolen USDC

69.    In the absence of an agreement, state law dictates whether a property interest exists.

*See Butner v. United States,* 440 U.S. 48, 55 (1979).

70.    The Liquidators cite no law to support the proposition that the lack of an agreement

itself means that a Bridge host has title to cryptocurrency assets.  Motion ¶ 60.  Neither case it cites

supports the claim.  In *Celsius*, the court applied a Bridge's terms of service and so it did not have

the occasion to decide the applicable ownership rights in the absence of express terms.  647 B.R.

at 637.  The same is true of *In re Voyager Digital Holdings, Inc.*, which cited agreements to hold

that debtors lacked title to funds held in certain accounts and the fact that "No party in interest has

argued to the contrary."  2022 Bankr. LEXIS 2178, at *8 (Bankr. S.D.N.Y. Aug. 5, 2022).

b.    Multichain Did Not Control Any Commingled Assets

71.    The Liquidators' argument about commingled assets does not support a stay

because Multichain did not control a bank account with commingled assets.  The Liquidators cite

*In re Radnor Holdings Corp.* for the proposition that "[m]oney paid from a bank account

containing commingled funds under a debtor's control is presumptively property of the debtor."

2009 Bankr. LEXIS 1815, at *7 (Bankr. D. Del. July 9, 2009).  That presumption does not apply

here because Multichain did not control any bank account or any account of any kind containing

commingled funds.

i.    Multichain Did Not Control the Liquidity Pool

72.    The express language of *Radnor* states that the presumption only applies to

"commingled funds under a debtor's control."  2009 Bankr. LEXIS 1815, at *7.  The decision

states that, to carry its burden, a debtor or trustee must establish "legal title to the account."  *Id.*

18

Legal title was established in that case because it concerned payments made from "the Debtors' general bank accounts." *Id.*

73.     Here, Multichain did not control the Stolen USDC or the Liquidity Pool. Multichain expressly promised it could not control it. *See* Section I.A.2, *supra* at 11. Multichain's lack of control of the Liquidity Pool is why it maintained a separate account it could control to compensate users after a security incident. Miller Decl. ¶ 31. The Liquidity Pool does not involve any accounts in Multichain's name or any accounts that Multichain used for its general operations like the account in *Radnor*. Accordingly, the presumption does not apply here.

                   ii.     The Stolen USDC Was Not Commingled Since It All Belongs to the
                           Class

74.     Even if the *Radnor* presumption applied, it is not true that the Stolen USDC was commingled; it was kept distinct from other types of assets in Multichain liquidity pools. Multichain organized separate liquidity pools for other types of cryptocurrency tokens, such as Bitcoin and Ethereum. Singapore Order ¶ 11. The Liquidity Pool kept the USDC distinct from those other assets. *See* Miller Decl. ¶ 30. Since the plaintiff in the Class Action is the class of all multiUSDC holders, their assets as a class were kept distinct, and the presumption should not apply here.

75.     The Liquidators' expert does not say otherwise. His report states that the Liquidity Pool kept the USDC deposited by some users in the same wallet as the USDC deposited by others. ECF No. 28 at ¶ 10. But the class's assets are not commingled with the assets held by nonmembers, and therefore, there is no commingling of assets to deprive the class of a presumption of ownership. Moreover, the fact that the Liquidity Pool only held class assets shows that the debtor recognized the Liquidity Pool as the class's distinct asset and not its own.

19

iii.    Even if the *Radnor* Presumption Applies, It is Overcome

76.    The *Radnor* decision cites *Cassirer v. Herskowitz (In re Schick)* as its basis for the presumption. 2009 Bankr. LEXIS 1815, at *7 (citing 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999)). The *Cassirer* court reasoned that, since a debtor can use commingled funds to pay unsecured creditors, a creditor who claims a beneficial interest in the property must be able to trace their interest to specific assets in a commingled account. 234 B.R. at 343. The creditor can overcome the presumption if it can "show that the debtor held only legal title and … trace the equitable owner's interest to the specific property at issue." *Id.* at 344.

77.    Here, to the extent Multichain owned the Liquidity Pool, it could not have held more than legal title since all the assets within the Liquidity Pool were subject to claims by multiUSDC holders. *See Cassirer*, 234 B.R. at 345 (holding debtor did not have more than legal title to funds in an account, despite physically controlling the account, since an agreement limited his use of the account's funds). And Tokenholders can trace their interest to specific property since the deposits by Tokenholders or their predecessors can be traced through public blockchain records. *See* Miller Decl. ¶ 30. This ownership history is sufficient under *Cassirer*. *See* 234 B.R. at 345 (holding bank records sufficient to trace funds in a commingled bank account).

c.    The Anonymous Tweet Is Not Evidence Multichain Held the Stolen USDC

78.    The Liquidators ask this Court to disregard Multichain's own statements that it did not own the Stolen USDC because a tweet it found on the internet suggests Multichain operated differently than it publicly represented (the "Anonymous Tweet"). Motion ¶¶ 28, 30. The post fails to support the Liquidators' position for three reasons. The Anonymous Tweet is inadmissible hearsay, discusses actions taken by Multichain's founder in his personal capacity, and includes language consistent with Multichain ***not*** owning the Stolen USDC.

20

i.    The Anonymous Tweet is Inadmissible Hearsay

79.    An immediate problem with the Anonymous Tweet is that it is inadmissible hearsay.  The Federal Rules of Evidence, including Rules 802-04 (Fed. R. Evid R. 802-04), apply in motions concerning the application of a stay.  *See, e.g., In re Applin,* 108 B.R. 253, 257 (Bankr. E.D. Cal. 1989) (citing Fed. R. Evid. 1101).

80.    No witness can establish that its author had firsthand knowledge about how Multichain operated.  And since the text of the statement reports that the CEO of Multichain was in Chinese police custody, it does not even purport to come from him.  Motion, Ex. G ¶ 1.  Nor can anyone cross-examine the author to determine what the Anonymous Tweet means or how to reconcile it with Multichain's public statements or an expert's review of the Multichain system.  Accordingly, the Anonymous Tweet is insufficient evidence of anything.

ii.    The Anonymous Tweet Discusses Zhaojun He, Not Multichain

81.    Even if the statements in the Anonymous Tweet were true, those statements only indicate that the founder of Multichain, Zhaojun He, controlled certain "MPC node servers" because they operated on Zhaojun's "cloud server account." Motion, Ex. G ¶ 1.  This does not mean that Multichain had control over the Stolen USDC for two reasons:

82.    First, Zhaojun He is not the same as Multichain.  Since the debtor here is Multichain and not Zhaojun personally, the claim that Zhaojun controlled the account does not mean that the account was Multichain's property.  For example, in *Cassirer,* a trustee tried to recover funds that had been in a law firm trust account the debtor controlled.  234 B.R. at 345.  The court distinguished between property held by the individual debtor and property held by the debtor's law firm.  *Id.* Here, the Anonymous Tweet suggests Zhaojun, distinctly from Multichain, controlled the Liquidity Pool.

21

83.     Second, there is a difference between having the node servers run on Zhaojun's personal cloud account and control over those servers.  *See* Miller Decl. ¶ 27.  Ultimately, the relevant issue for the presumption is whether the debtor in this case controlled the contents of the Liquidity Pool.  *See id.*  The Liquidators fail to explain why the location of the node servers or a vendor that services them is relevant to whether Multichain controlled them.  As James Miller explains, one does not necessarily follow from the other.  *See id.*

84.     A separate line from the Anonymous Tweet also fails to support the claim Multichain controlled the nodes.  The line mentions that Zhaojun controlled "all operational funds and investments from investors."  Motion, Ex. G ¶ 2.  But operational funds or investor funds are distinct from the Liquidity Pool, which did not contain operational funds.  Miller Decl. ¶ 31.

### iii.     The Anonymous Tweet Language is Consistent With Multichain Not Owning the Stolen USDC

85.     Finally, the Anonymous Tweet itself refers to assets in the Liquidity Pool multiple times as "user assets."  Motion, Ex. G ¶¶ 8-9.  This reflects the author's own public agreement that Multichain did not own those assets, but that they instead belonged to "users."

86.     The Anonymous Tweet also confirms that "[t]he Multichain protocol continued to operate as designed."  *Id.* ¶ 7.  Since the protocol was designed to be "non-custodial," the message—if it were not hearsay—would confirm that the protocol did, in fact, operate that way.  *See* Higgins Decl. Ex. 1.

### d.     The Liquidators' Expert Offers Nothing to Suggest Multichain Owned the Stolen USDC

87.     The Liquidators' expert does not state that Multichain owned the Stolen USDC but instead speculates that it is possible that Multichain could have controlled it.  But since it is the Liquidators' burden to establish Multichain owned the Stolen USDC, this speculation is insufficient.  *See TMT Procurement Corp.*, 764 F.3d at 523.

22

88.     The Liquidators' expert first claims that Multichain's software contained a mechanism that could have enabled someone to bypass the independent nodes and control it with a separate private key.  ECF No. 28 ¶ 8.  But the expert does not provide any evidence to suggest that Multichain held this key or that anyone besides the independent nodes could generate it.  *Id.* Moreover, James Miller confirms that this mechanism still requires the consent of the nodes and is a standard testing feature.  Miller Decl. ¶ 26.

89.     The Liquidators' expert next speculates that someone could have controlled multiple nodes, despite Multichain's promise that the nodes were independently controlled.  ECF No. 28 ¶¶ 9, 20, 28, 30.  But the Liquidators offer no evidence to suggest that someone actually had that control.  Instead, the expert complains that Multichain's software had no automatic mechanism to confirm that Multichain's promise was correct.  *Id.* ¶¶ 16-18.  He notes that it would have been "best practices" for Multichain to publicly disclose who controlled the Liquidity Pool. *Id.* ¶¶ 18, 31.  And he writes that the audits of the Bridge did not address the possibility that Multichain secretly controlled the nodes.  *Id.* ¶¶ 22-24.  This is not the same as saying Multichain did control the nodes or the Liquidity Pool.  Moreover, James Miller explains that no such best practices exist and protection from a possible cyberattack is a legitimate reason not to disclose the owners of nodes.  Miller Decl. ¶ 42.

II.     <u>A Discretionary Stay Pursuant to Section 1521 or Section 105 is Not Appropriate Here</u>

90.     The Liquidators fail to present a compelling reason for the Court to exercise its discretion to stay the Class Action, even though it does not concern Multichain's assets.

A.     <u>Section 1521 Relief is Not Appropriate Since the Class Action Does Not Concern the Debtor's Assets, Rights, Obligations or Liabilities</u>

91.     The relevant provision of Section 1521 only permits staying actions "concerning the debtor's assets, rights, obligations or liabilities."  11 U.S.C. § 1521(a)(1).

23

92.    As explained in Section I.A, *supra* at 10, Multichain agreed that the Stolen USDC is not its asset.  And as explained in Section I.B, *supra* at 13, it never held or owned those assets.

93.    Multichain fails to allege a right to the Stolen USDC.  It did not have a contract right to it.  *See* Section I.A, *supra* at 10.  To the contrary, it expressly disclaimed such a right.  *Id.*

94.    The Class Action does not arise from or seek to enforce any obligations or liabilities of Multichain.  The Liquidators misstate its claims to suggest that they do.  They argue the class claims "necessarily implicate Multichain's potential obligations to all users of the Multichain Bridge Software, not merely Multi-USDC holders, who transferred digital assets to Multichain in reliance on the protocol's operation."  Motion ¶ 78.  They do not say how the Class Action claims implicate Multichain's obligations.  *Id.*  Nor can they:  The Class Action asserts an equitable claim for constructive trust, avoiding the potential unjust enrichment by Circle.  *Id.* ¶¶ 75-76.  Its plaintiffs do not claim to be creditors of Multichain or derivative creditors of Circle.  *Id.*

B.    Section 1521 Relief is Not Necessary to Ensure Equal Treatment of Multichain's Creditors

95.    The Liquidators contend that the Court should stay the Class Action, even if the Stolen USDC did not belong to Multichain, so that the Singapore Court may treat Multichain's creditors equally.  The argument fails for two reasons.

96.    First, if the Stolen USDC is not an asset of Multichain, then Multichain's creditors cannot collect it.  No stay is necessary to permit the Liquidators to distribute assets Multichain did not own.  Moreover, the Liquidators fail to explain why the U.S. dollars in which multiUSDC holders held an interest should be used to satisfy claims that holders of other wrapped tokens could assert.

97.    Second, the Class Action seeks relief for an entire class.  Accordingly, it does not enable a small number of creditors to take undue priority over similarly situated creditors.  Instead,

24

class counsel will have a duty to ensure that class members are treated fairly. *See, e.g., Maywalt v. Parker & Parsley Petroleum Co.,* 155 F.R.D. 494, 496 (S.D.N.Y. 1994). The Liquidators assert, without providing any supporting detail, that Tokenholders have filed claims against Multichain in Singapore. Motion ¶ 79. The Class Action can properly include those Tokenholders as class members and consider their interests.

      C.      <u>The Liquidators Fail to Cite Authority Supporting Section 1521 Relief</u>

98.      The Liquidators cite two cases to support its argument that the Court should issue a discretionary stay pursuant to Section 1521(a)(1): *In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009) and *In re Avanti Comms. Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018). Both cases are distinguishable.

99.      In *Atlas Shipping*, a Danish court declared bankrupt an international shipping company. 404 B.R. at 739. Some creditors sought and obtained attachments for the debtor's assets located in New York, two prior to and seven after the commencement of the bankruptcy proceeding in Denmark. *Id.* After the Chapter 15 recognition hearing, the foreign representative sought, and the court granted, relief under Section 1521(a)(5) and (7) to vacate the attachments and require creditors to turn over garnished funds to be administered in the Danish bankruptcy proceeding. *Id.* Unlike the present case, *Atlas Shipping* does not involve a request to stay litigation, nor does it involve a dispute over whether the debtor owns the assets at issue.

100.      In *Avanti Comms.*, the debtor was a satellite operator based in England. 582 B.R. at 612. The foreign representative initiated a Chapter 15 proceeding to enforce the UK court-approved reorganization plan, including some third-party releases. *Id.* The court decided to recognize the reorganization plan and enforce the third-party releases based largely on principles of comity. *Id.* Unlike the present case, *Avanti Comms.* does not involve a request to stay litigation.

25

Unlike in *Avanti Comms.*, the foreign representative of Multichain has not sought recognition and enforcement of a foreign reorganization plan.

    D.    <u>Section 1521 Relief is Not Appropriate Since It Would Not Sufficiently Protect Multi USDC Tokenholders</u>

101.    Section 1522(a) states that the Court may "only" provide relief under Section 1521 "if the interests of the creditors and other interested entities … are sufficiently protected." 11 U.S.C. § 1522(a). The *Atlas Shipping* court noted that "sufficient protection" includes "the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding." 404 B.R. at 740.

102.    Here, staying the Class Action would not protect multiUSDC tokenholders because it would require them to inconveniently litigate in Singapore to vindicate the fact that the Stolen USDC does not belong to Multichain and then resume litigation in New York to collect the underlying assets. This is unnecessarily complicated, especially since USDC is a U.S. dollar denominated asset, and so its primary utility was for holders in the United States or who did business with U.S. entities.

    E.    <u>The Liquidators Have Not Established "Unusual Circumstances" to Warrant an Injunction Pursuant to Section 105</u>

103.    The Liquidators are seeking the Court to enjoin a third-party action under 11 U.S.C. § 105(a). Such an injunction may only be proper under "unusual circumstances." *In re Foodservicewarehouse.com, LLC*, 601 B.R. 396, 411 (E.D. La. 2019) (quoting *Feld v. Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995)). "Such unusual circumstances include [(i)] when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and [(ii)] when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *Id.* If the Court does not find that such unusual

26

circumstances exist, "the court may not enter an injunction of the third-party action." *Id.* None of these unusual circumstances exist here.

104.   Under the first set of unusual circumstances, when the nondebtor and debtor share an identity of interests, courts have entered injunctions pursuant to Section 105(a) for the benefit of a debtor's guarantor, indemnitor, director, or officer. *See e.g.*, *In re Phila. Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Penn. 2009) (finding "the Debtors owe potential contractual and common law duties to indemnify the Non-Debtors"); *W.R. Grace & Co. v. Chakarian*, 2004 Bankr. LEXIS 579, at *9-10 (Bankr. D. Del. 2004) (finding "unusual circumstances" where the non-debtor is entitled to indemnification from the debtor); *Amer. Film Techs. v. Taritero*, 175 B.R. 847, 850 (Bankr. D. Del. 1994) (citing cases where proceeding against directors and officers risks liability as agents of the debtor). This set of circumstances does not exist here, as neither the Tokenholders nor Circle are guarantors, indemnitors, directors, or officers of Multichain.

105.   Under the second set of unusual circumstances, when the third-party litigation adversely impacts the debtor's reorganization efforts, the *Foodservicewarehouse.com* court found that because the case involved a liquidation, not a reorganization, a third party's pursuit of its own claims against another third party did "not threaten to interfere with the administration of the case." 601 B.R. at 411. The Singapore Insolvency Proceedings likewise involve a liquidation, not a reorganization. Thus, the Named Plaintiffs' pursuit of claims on behalf of all Tokenholders does not threaten to interfere with the administration of Multichain's case.

106.   The Liquidators cite two cases to support its argument that the Court should enter an injunction pursuant to Section 105(a): *Alexander v. Jensen-Carter (In re Alexander)*, 289 B.R. 711 (8th Cir. BAP 2003) and *Nevada Power Co. v. Calpine Corp.*, 365 B.R. 401 (S.D.N.Y. 2007). Both cases are distinguishable.

27

107.   In *Alexander*, the debtor in a Chapter 7 proceeding filed repeated motions in an attempt to recover property from the estate, including motions to remove the trustee and motions to force abandonment of property.  289 B.R. at 715.  The trustee sought an injunction pursuant to Section 105(a) to prevent the debtor from filing further motions and abusing the bankruptcy process.  *Id.*  The court issued the injunction because the debtor's actions were hindering the trustee's ability to administer the estate.  *Id.*  Unlike the present case, *Alexander* does not involve any third-party litigation, nor does it involve a Chapter 15 proceeding.

108.   In *Nevada Power*, a creditor had initiated pre-petition litigation against the debtor and its guarantor.  365 B.R. at 409.  This litigation became subject to the automatic stay with respect to the debtor when it filed its Chapter 11 petition.  *Id.*  The debtor sought to stay the litigation with respect to its co-defendant guarantor.  *Id.*  The court issued an injunction pursuant to Section 105(a) because the action against the guarantor would still require involvement in the litigation of the debtor's key employees, which would be burdensome and a distraction from their work on the debtor's reorganization efforts.  *Id.*  Unlike in *Nevada Power*, Multichain is not involved in the underlying litigation and is not engaged in reorganization efforts.

109.   The Liquidators cite three additional cases to support their argument that "piecemeal adjudication frustrates the core purpose of chapter 15."  Motion ¶ 80.  Two of the cases involve a stay of litigation, but the litigation in both cases were creditor actions directly against the debtor.  *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr. S.D.N.Y. 2022); *In re Energy Coal S.P.A.*, 582 B.R. 619, 626–27 (Bankr. D. Del. 2018).  The third case involves vacating an attachment on the debtor's assets in New York to allow them to be distributed in a Swedish bankruptcy proceeding.  *Victrix S.S. Co., S.A. v. Salen Dry Cargo*, A.B., 825 F.2d 709,

28

713–14 (2d Cir. 1987). Unlike these cases cited by the Liquidators, the Class Action does not involve Multichain or its assets.

III.    The Liquidators Fail to Meet the Requirements for Injunctive Relief

    A.    A Stay Will Not Prevent Irreparable Harm

110.    The Liquidators' speculation about potential rulings the District Court may issue in the Class Action do not constitute irreparable harm for the purpose of injunctive relief. A vague reference to piecemeal litigation or the possibility of inconsistent results is insufficient to establish irreparable harm. *See Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.)*, 651 B.R. 622, 660 (Bankr. S.D.N.Y. 2023).

111.    *Rockville Ctr.* is instructive. In that case, the debtor sought to stay state court actions by different plaintiffs alleging the debtor was liable for abuse. 651 B.R. at 659. The debtor argued that different plaintiffs in state court may have different outcomes, which would have negative effects on the bankruptcy. *Id.* at 660. It failed to explain what those effects were, and so the Court denied the stay.

112.    Here, the Liquidators argue that, without a stay, the District Court may grant class certification or decide that the Tokenholders are entitled to equitable relief from Circle. But they fail to explain how that constitutes irreparable harm to Multichain. It does not affect the Liquidators' right to collect on Multichain's own debts or marshal Multichain's assets in the United States. And it does not prevent the Liquidators from seeking to intervene in the Class Action if it believes it necessary to avoid an incorrect result.

    B.    The Balance of the Equities is Neutral Here

113.    Denying the stay will not harm the Liquidators, who are still free to litigate claims to collect Multichain's assets in the United States. Although the Stolen USDC is not among those assets, the Liquidators can argue otherwise in the Class Action just as well as they can do so here.

29

114.   Similarly, applying the stay will require the Tokenholders to litigate their claims here and then again in the Class Action.  Although this is more cumbersome, time consuming, and expensive, it may not be sufficiently so to tip this factor decidedly against the stay.

115.   The Liquidators incorrectly argue the balance of the equities weighs in their favor by citing the concerns of Multichain's creditors who do not hold multiUSDC tokens.  Motion ¶ 87.  The Liquidators may still marshal and distribute assets to those unsecured creditors without the stay, and applying the stay will not ultimately allow them to distribute assets that do not belong to Multichain.

C.    The Public Interest Weighs In Favor of the Tokenholders

116.   The "public interest is served by enforcement of contract provisions agreed to…" *Alexander SRP Apartments, LLC v. LSREF2 Baron, LLC (In re Alexander SRP Apartments, LLC)*, 2012 Bankr. LEXIS 3292, at *12 (Bankr. S.D. Ga. June 4, 2012).  Here, the public interest weighs in favor of applying the Multichain terms as written.

117.   The public interest is not served by taking assets that belong to the Tokenholders and distributing them to Multichain's creditors, even though Multichain never owned those assets. The Liquidators contend that the public is served by maximizing the potential recovery by Multichain's creditors, but they assume the Stolen USDC is Multichain's property.  Because it is not, they have no argument for why the public interest compels distribution of someone else's property.

IV.   Even if the Stay Applies, the Court Should Grant Relief From the Stay

118.   The Second Circuit held in *In re Sonnax Industries, Inc*., that this Court should consider a dozen factors when deciding whether to permit litigation to proceed in another forum despite the application of the automatic stay.  907 F.2d 1280, 1286 (2d Cir. 1990).  Because the

connection between Multichain and the $63 million is so tenuous, those factors weigh here towards permitting the Class Action to proceed.

119. The first factor is "whether relief would result in a partial or complete resolution of the issues" and weighs in favor of relief from the stay. *Id.* The Class Action would result in a complete resolution of the issues as related to all Tokenholders. The Named Plaintiffs intend to represent a class that includes all Tokenholders to recover the funds from Circle backing the Stolen USDC.

120. The second factor is "lack of any connection with or interference with the bankruptcy case" and weighs in favor of relief from stay. *Id.* The Class Action is not an action against Multichain or its assets, nor is it an action to enforce an obligation or liability of Multichain. While the Liquidators purport that Multichain has its own claim against Circle, that should not preclude the Named Plaintiffs from pursuing their Class Action.

121. The third factor is "whether the other proceeding involves the debtor as a fiduciary" and weights in favor of relief from stay. *Id.* The Class Action does not involve Multichain as a fiduciary or otherwise.

122. The fourth factor is "whether a specialized tribunal with the necessary expertise has been established to hear the cause of action" and is not applicable here. *Id.* A specialized tribunal is not necessary to determine the issues set forth in the Class Action.

123. The fifth factor is "whether the debtor's insurer has assumed full responsibility for defending it" and weighs in favor of relief from stay. *Id.* Again, the Class Action does not involve Multichain at all and thus, its insurer cannot have assumed any responsibility for it.

31

124.    The sixth factor is "whether the action primarily involves third parties" and weighs in favor of relief from stay.  *Id.*  The Class Action *only* involves third parties, namely all Tokenholders and Circle.

125.    The seventh factor is "whether litigation in another forum would prejudice the interests of other creditors" and weighs against relief from stay.  *Id.*  If the Named Plaintiffs, on behalf of the purported class, recover the funds from Circle backing the Stolen USDC, then the Liquidators' efforts to recover from Circle may be impacted.

126.    The eighth factor is "whether the judgment claim arising from the other action is subject to equitable subordination" and is not applicable here.  *Id.*  A judgment in the Class Action would not result in a claim in this Chapter 15 proceeding or the Singapore Insolvency Proceedings.

127.    The ninth factor is "whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor" and weighs in favor of relief from stay.  *Id.*  Again, a judgment in the Class Action would not result in a claim in this Chapter 15 proceeding or the Singapore Insolvency Proceedings.  Even if it did, Chapter 15 does not provide foreign representatives with avoidance powers.  *See* 11 U.S.C. § 1521(a)(7).

128.    The tenth factor is "the interests of judicial economy and the expeditious and economical resolution of litigation" and weighs in favor of relief from stay.  *Sonnax*, 907 F.2d at 1286.  The Class Action has now been delayed twice by bankruptcy filings of debtors claiming to have an interest in the funds held by Circle. If granted relief, the Named Plaintiffs will vigorously prosecute the Class Action to recover the funds from Circle on behalf of all Tokenholders.

129.    The eleventh factor is "whether the parties are ready for trial in the other proceeding" and weighs against relief from stay.  *Id.*  The Class Action is still in the early stages of litigation.  Prior to Circle's removal to federal court, the Named Plaintiffs filed an amended

32

class complaint and a motion for class certification that remains pending, and Circle has indicated it intends to move to dismiss the amended class complaint.

130.     The twelfth factor is "impact of the stay on the parties and the balance of harms" and weighs in favor of relief from stay. *Id.* Again, the Class Action has now been delayed twice by bankruptcy filings of debtors claiming to have an interest in the funds held by Circle. Further delay will continue to harm all Tokenholders by keeping them from having their day in court.

131.     Given that a clear majority of the applicable factors—eight out of ten—weigh in favor of relief from stay, the Court should grant the Named Plaintiffs such relief and allow them to pursue the Class Action on behalf of all Tokenholders.

## Conclusion

132.     The Named Plaintiffs respectfully request the Court deny the Liquidators' motion to stay the Class Action and grant any other relief it deems just.

33

Dated: Brooklyn, New York
   March 10, 2026

            Respectfully submitted,

            WILL NEWMAN LAWYER PLLC

            William H. Newman
            Tara Q. Higgins
            33 Nassau Avenue, Second Floor
            Brooklyn, New York 11222
            Phone: (718) 218-3360
            Email: will@willnewmanlawyer.com
               tara@willnewmanlawyer.com