**WILL NEWMAN LAWYER PLLC**
William H. Newman, Esq.
Tara Q. Higgins, Esq.
33 Nassau Avenue, Second Floor
Brooklyn, New York 11222
Phone: (718) 218-3360
will@willnewmanlawyer.com
tara@willnewmanlawyer.com

*Attorneys for Newton AC/DC Fund L.P., Scallion Trading Ltd., and Stanton Street Capital Partners, Inc.*

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | |
|---|---|
| In re: | Case No.:  25-12340 (DSJ) |
| MULTICHAIN FOUNDATION LTD., | Chapter:  15 |
| Debtor in a foreign proceeding. | |

## DECLARATION OF JAMES MILLER

1.      I am the Engineering Director of the cryptography team at Trail of Bits, Inc. ("TOB").  I am an expert in cryptocurrency technology and I write to provide technical background and an expert opinion on matters related to the above-captioned matter.  I have read the declaration of Andreas Freund (ECF No. 28, the "Freund Decl.") and I also write to provide comments on it.

**Education and Qualifications**

2.       Prior to my work at TOB, I spent two years in a cryptography PhD program at Yale University, where I researched lattice-based cryptography and related problems. Before my studies at Yale, I obtained a Master's degree in pure mathematics from the University of Cambridge and a Bachelor's degree in physics and mathematics from the University of Notre Dame.

3.      In over six years of work at TOB, I have led security assessments of some of the most critical and high-value cryptographic protocols deployed on-chain, with a particular focus on multi-party computation (MPC) and threshold signature schemes (TSS).  My work in this area includes security reviews of Lit Protocol's Cait-Sith protocol, Chainflip's cross-chain MPC

infrastructure, Silence Laboratories' Silent Shard MPC wallet, and several other MPC/TSS-based blockchain protocols.

4.      More broadly, I have reviewed a wide spectrum of cryptographic software and protocols, including zero-knowledge proof systems, post-quantum cryptography implementations, hardware security modules (HSMs), and trusted computing platforms such as Intel TDX and AWS Nitro Enclaves.

5.      As part of my work for TOB, I performed an audit of the Anyswap system in 2021.  That system is the predecessor to Multichain.  Its management retained TOB for the audit.

**General Facts About Cryptocurrency Technology**

6.      Cryptocurrencies are assets that people can own and transmit to others.

7.      An individual unit of a cryptocurrency is often called a token, and there are thousands of different kinds of tokens.

8.      Decentralized computing infrastructure cryptographically verifies and immutably records on a "blockchain" every transaction which creates, destroys or transfers a token.

9.      A blockchain is a decentralized and immutable ledger maintained by hundreds or thousands of participating computing nodes called either validators or miners.

10.     Ownership of cryptocurrencies is established by demonstrating the possession of a private key, which is uniquely associated with a public address (also known as a wallet), which is analogous to a bank account number.  A key is necessary to authorize a transaction involving a cryptocurrency smart contract or wallet.  A smart contract is an autonomous computer program that exists on a blockchain.

11.     Traditionally, a blockchain with all its associated tokens functions as an independent and isolated system of recording financial transactions. However, as there are hundreds of different blockchains, people have developed mechanisms for safely and securely transferring cryptocurrency between blockchains.

**Multichain Operated a Cross-Chain Bridge Using MPC**

12.     Multichain Foundation Ltd. ("Multichain") created a cryptocurrency platform that enables users to transfer tokens between blockchains.  That is, the platform (the "Platform") permitted a token whose issuance and transfers were validated and recorded on one blockchain to be effectively ported or bridged, via creation of an economically equivalent proxy token, to a

different blockchain where it could be utilized in a similar fashion.  The Platform was originally called Anyswap, but Multichain later renamed it Multichain.

13.     The Platform accomplished this goal by requiring users to deposit the asset that they want to bridge into a particular address (called an externally owned address, or "EOA") controlled by a group of MPC nodes. This document will refer to this address as the "MPC address." The MPC address is not itself a liquidity pool; rather, it is an entity authorized to operate the liquidity pool. Multichain described these bridge accounts as "liquidity pools," and the MPC address does serve as the source of liquidity for the redemption of wrapped tokens.

14.     Once a user transfers an asset to the MPC address, the external Platform infrastructure[1] triggers a smart contract on the destination blockchain to issue an equivalent amount of new, proxy tokens (usually called "wrapped" tokens) to that user's corresponding (or specified) address on that second blockchain. The user can then use the wrapped token on the second blockchain in the same manner as the original asset was used on the first blockchain. As long as everything is working properly, a user can, at any time, reverse the process by depositing the wrapped tokens back in the smart contract on the second blockchain (resulting in those wrapped tokens being extinguished), which then initiates the process of triggering the MPC address to release an equivalent amount of the underlying asset to the user's corresponding address. A critical invariant of this system is that each side of the bridge should have matching transactions. In other words, if the MPC address releases a certain amount of an asset on one chain, there should always be a corresponding deposit transaction on the other side of the bridge that authorized this release. This document will use the term "unauthorized transfer" to refer to any instance in which assets were released from the MPC address without a corresponding deposit on the other side of the bridge.

15.     Because wrapped tokens can be freely exchanged for an equivalent amount of underlying assets, the value of each wrapped token is maintained stable at the same value as the underlying asset.

**Explaining Terms Used on the Multichain Website**

16.     The Multichain website references "MPC nodes."  MPC nodes are a group of independent systems that can work collectively to generate signatures for cryptocurrency transactions.

17.     The Multichain website states that when "assets are redeemed, the Wrapped Asset smart contract is triggered by the MPC nodes to burn the tokens. The MPC nodes then release the assets from the Decentralized Management Account and send them to the user on the origin

---

[1] By "external," I mean software that exists off-chain, in contrast to on-chain software in the form of smart contracts. Cross-chain bridges necessarily require external infrastructure.

chain." This means that users can exchange wrapped tokens for corresponding underlying assets in the MPC address.

18.     On the same page, Multichain stated that in redemption, the wrapped tokens "are burned and then the SMPC nodes release non-wrapped assets on the origin chain." This means that users receive non-wrapped assets once they redeem wrapped tokens.

## **Multichain Operated a Distributed Key Management System**

19.     Rather than entrusting the bridge's private key to a single entity, Multichain designed a system to distribute key control among multiple MPC node operators, so no single operator could unilaterally authorize transactions. This was a design choice intended to reduce centralized control over user assets.

20.     The MPC nodes were automated software programs, not people manually approving transactions. Once deployed and configured, each node automatically monitored the blockchain for new user deposits. When a deposit was detected, the nodes independently verified the transaction and then cooperatively produced a cryptographic signature through an automated protocol, without any human review or intervention for individual transactions. The process was comparable to how a smart contract automatically executes when triggered by a transaction, except that the automation occurred off-chain across multiple nodes rather than on-chain in a single contract.

21.     Multichain implemented a TSS protocol (the "Protocol") commonly referred to as the GG20 protocol, published by Rosario Gennaro and Steven Goldfeder in 2020. Multichain wrote its own implementation of this protocol, with some code that builds upon the open-source implementation of the same protocol used by the cryptocurrency exchange Binance[2]. In the Protocol, every node in the group of MPC nodes possesses a portion of the secret key, and some combination of those nodes could use the Protocol to sign particular transactions without full knowledge of the key. I have personally reviewed the Protocol code and can confirm that it is written as I described.

22.     The Protocol is a major component of the Platform since cross-chain bridges generally need to promote their security systems to attract users.

---

[2] Binance is a global cryptocurrency exchange and broader crypto-services platform which runs the largest centralized cryptocurrency exchange in the world as well as Binance Smart Chain, which is one of the top-5 blockchains by market capitalization and on-chain activity.

**Multichain Operated the MPC Address and the Smart Contract That Issued multiUSDC**

23.     Multichain developed the platform through which USDC was deposited and multiUSDC was issued.

24.     USDC is a stablecoin, a cryptocurrency designed to enable users to engage in transactions denominated in U.S. dollars.  Stablecoins exist in other currency denominations, such as British pounds and Euros.

25.     I performed a security review in 2021 of the MPC component of the Platform software, which uncovered several critical vulnerabilities that, if exploited at the time, would have allowed unauthorized extraction of the full MPC Address EOA private key. This extraction would require control of just one of the MPC nodes. At a later time, security researchers at Verichains uncovered similar vulnerabilities, which they publicized in a disclosure that they named "TSShock." All of these vulnerabilities identified by both Verichains and me were fixed shortly after they were disclosed to the Multichain team, and these fixes are publicly verifiable in the open-source code. With these flaws fixed, I do not see any indication of a mechanism to control the MPC address holding USDC without compromising or controlling the MPC nodes.

26.     Mr. Freund refers in his declaration to a "non-MPC signing path," but I find this reference misleading. The codebase includes a configuration flag that allows signing with a raw key instead of using the Protocol; however, this flag is documented as a testing feature and, more importantly, can only be used with full knowledge of the private signing key. The theoretical guarantees of the Protocol ensure that when implemented correctly, none of the MPC nodes can ever obtain full knowledge of the private key. In other words, this configuration flag alone cannot be abused; compromising the MPC address still requires compromising the MPC nodes to obtain the full key. Moreover, I do not find this configuration flag suspicious; the Protocol is complex and slow to run, so having a mechanism to test the Platform without invoking the Protocol is sensible.

27.     Even if multiple or all MPC nodes existed on one person's cloud account, that would not guarantee that the holder of the account can control the nodes or the MPC address. While this does represent a significant centralization risk, the exact configuration of the cloud platform is not publicly known or verifiable, and so we do not have details on who was given roles and access to various nodes. These settings can only be reviewed with access to the private cloud account. The social media post that Multichain's liquidators cite in their motion papers (the "Tweet"), which claims some nodes were operating "under" the CEO's personal account, does not provide any logs, screenshots, or other evidence to support or verify the claim that the nodes were operating in this account and that the CEO could access the secrets residing on these nodes.

28.     I have analyzed the publicly accessible on-chain data pertaining to the July 6, 2023, hack of the Platform. In particular, I've analyzed all transactions on the cross-chain bridge. All transactions related to the hack are unauthorized transfers in which assets were removed from the MPC address without an equivalent deposit on the other side of the bridge. My analysis identified an additional unauthorized transfer of 2 USDC, six days before the hack, on June 30, 2023, which is the first evidence of compromise of this bridge. I do not see any evidence that anyone compromised the MPC nodes or the bridge before June 30, 2023. All outbound transfers before that date are consistent with routine user asset deposits and withdrawals. This pattern is inconsistent with Multichain treating this platform as a source of funds for its own use.

29.     Blockchain records reflect that MPC nodes authorized transactions thousands of times.  No evidence exists that Multichain ever unilaterally took any action with the MPC address.  Based on the publicly available evidence, it is not possible to distinguish between several competing hypotheses for the July 2023 exploit: (a) that the CEO unilaterally controlled all MPC nodes; (b) that multiple node operators colluded; or (c) that an external attacker compromised a sufficient number of nodes. All of these scenarios would produce identical on-chain transaction signatures. The primary source attributing sole control to the CEO is the Tweet, which provides no technical evidence, no server logs, no screenshots of cloud configurations, and does not even identify the cloud provider used. This Tweet does not constitute a transparent or comprehensive investigation of the incident.

30.     The MPC address recorded USDC separately from other assets that Platform users could deposit. This is because the blockchain that records cryptocurrency transactions separately records transfers of different kinds of cryptocurrency tokens.  The Ethereum blockchain records each individual USDC deposit to the MPC address.

31.     Multichain operated a security account and held operational and investor funds in separate wallets. By contrast to its claims of having multiple, distinct entities collaboratively control the MPC addresses, Multichain appeared to have direct access to these wallets by design.

32.     The MPC address did not conduct any transaction involving Multichain's own wallets. Instead, it merely enabled users to deposit and withdraw USDC.

33.     Mr. Freund observes in his declaration that the MPC address is an EOA, and thus concludes Multichain misrepresented it in a public statement that there was no "weak link" EOA. However, this statement about weak-link EOAs could have been a reference to using MPC to generate an EOA whose private key is not known to any single individual, which can be done using their codebase.  This does not suggest that Multichain could bypass the MPC system since, as I explained in paragraphs 25-29, the design of the Platform and its transaction records are inconsistent with that conclusion.

**The MPC System Compared to Uniswap**

34.     The Multichain MPC system was similar to Uniswap in that it was designed to automatically manage funds according to predefined rules, rather than granting arbitrary control to any single entity. Both protocols perform predefined, automated actions with respect to the tokens they manage.

35.     Uniswap operates through consensus among hundreds or thousands of computer nodes, all agreeing to move funds in the same way. The Multichain MPC system similarly operated by moving funds based on the consensus of several nodes, each implementing a common automatic protocol.

36.     Although Uniswap allowed third parties to create liquidity pools, that does not affect the structure of each individual pool.

**I Worked on An Audit of the Platform**

37.     Mr. Freund references multiple audits of the Platform in his declaration.  I performed one of those audits and drafted the audit report after Multichain hired TOB.

38.     My primary contact at Multichain was Zhengxin Gao, not the CEO, Zhaojun He, though there was some contact with the CEO. Maintenance of the Platform was conducted by multiple individuals, not solely by the CEO.

39.     Mr. Freund writes that the scope of all the audits of Multichain's system did not include the MPC node architecture.  Freund Decl. ¶¶ 22-24.  This is correct, as mine and the other audits only reviewed smart contracts and the Protocol implementation. However, I find these remarks misleading. First, the audits targeted critical components (smart contracts and the Protocol) that could compromise the entire system if a single flaw were to occur. These audits uncovered real and severe vulnerabilities that were promptly fixed. Moreover, many projects intentionally choose not to disclose specific details around node operators to prevent them from being targeted. It is common for a security review to assess topics such as MPC node configuration and deployment and not publish the results; my team has done this with our clients before. Therefore, I do not see the choice of audit scope and targets in the public audit reports to be suspicious.

40.     The extent of auditing conducted by Multichain met reasonable standards. Audits commonly focus on smart contract code because their security is critical to the safety of users, and these are immutable and always visible on the blockchain, allowing for public validation of audit results and fixes. Off-chain code, like the code the MPC nodes ran, do not have this same public immutability, but they are a common audit target because they are an equally critical

component, as its correctness is central to the security and safety of the platform. Choosing these components for the audit scope is consistent with other, similar platforms.

**The Freund Declaration Does Not Support the Claim Multichain Controlled the MPC Address**

41.     Mr. Freund observes that someone could access the MPC address without the nodes' permission if that person had the key. Freund Decl. at ¶¶ 8-9. There is, however, no indication that Multichain could obtain the key. By design, the system was intended to prevent any one person or entity from having the key. And this observation is not unique to Multichain; anyone with the right key could take control over any cryptocurrency bridge of this type.

42.     Mr. Freund observes that the Platform software "contained no mechanism for verifying that MPC nodes were actually run by different organizations," concluding it did not follow "best practices." Freund Decl. at ¶¶ 16-18. First, this conclusion would imply that there exists a common or standardized set of "best practices" for this technology. However, unlike other cryptographic protocols, TSS lacks formal standards; it is non-standardized cryptography, although an ongoing NIST standardization effort is underway. Moreover, even if such a standard existed, I would not expect it to include requirements for a software verification mechanism (this is not mentioned in the ongoing NIST effort). This is because it is not straightforward to do this effectively; proving nodes are controlled by different organizations requires proving a negative that an organization doesn't control a particular device.

_____
James Miller

Dated: March 9, 2026