UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

In re: Chapter 15

Multichain Foundation LTD, Case No. 25-12340 (DSJ)

Debtor.
------------------------------------------------------------ X

**DECISION DENYING MOTION TO STAY NEWTON PROCEEDINGS**

**APPEARANCES:**

**CAHILL GORDON & REINDEL LLP**
*Counsel for Debtor*
32 Old Slip
New York, NY 10005
By: Gregory Strong, Esq.

**WILL NEWMAN LAWYER PLLC**
*Counsel for Newton AC/DC Fund, L.P., Scallion Trading Ltd., and Stanton Street Capital Partners, Inc.*
33 Nassau Avenue, Second Floor
Brooklyn, New York 11222
By: William H. Newman, Esq.
Tara Q. Higgins, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## I. INTRODUCTON

Before the Court is a motion to declare subject to the automatic stay or otherwise cause to be stayed an action that is pending in the United States District Court for the Southern District of New York, in which the plaintiffs are Newton AC/DC Fund, L.P. ("**Newton**"), Scallion Trading Ltd. ("**Scallion**"), and Stanton Street Capital Partners, Inc. ("**Stanton Street**," and, collectively with Newton and Scallion, the "**Newton Plaintiffs**"). The defendant in that action is Circle Internet Financial, LLC ("**Circle**"). This decision refers to that action as the "Newton Proceedings."

The plaintiffs in the Newton Proceedings seek to recover, for the benefit of certain asserted class members, U.S. currency or equivalents that back digital assets known as USDC that hackers stole from a cryptocurrency platform operated by Multichain Foundation Ltd. ("Multichain"). Multichain's platform, which is described below, provided a "bridge" that allowed holders of tokens that were on one blockchain, such as Ethereum, to transfer those tokens to another blockchain that ordinarily could not or would not accept token transfers from the source blockchain.

Following the hack, one of Multichain's asserted creditors, Fantom Foundation Ltd. ("**Fantom**"), initiated insolvency proceedings against Multichain in Singapore where the company was incorporated. Subsequently, the Singaporean court entered an order providing for the winding up of Multichain and appointing official liquidators to oversee the liquidation and the administration of Multichain's assets. In October 2025, the official liquidators (the "**Liquidators**" or "**Foreign Representatives**") filed a Chapter 15 petition in this Court [ECF No. 1], along with a motion seeking this Court's recognition of the foreign proceedings and an order staying the Newton Proceedings [ECF No. 2].

The Newton Plaintiffs initially objected to the Liquidators' request to stay the Newton Proceedings [ECF No. 14], and the parties ultimately consented to the entry of an order granting recognition of the Singaporean proceeding while deferring to a later date this Court's consideration and ruling on whether the Newton Proceedings are subject to the automatic stay [ECF No. 25]. To preserve the status quo, the Court's order also required Circle to continue its earlier blacklisting of specified addresses, which the parties agreed would prevent the movement or dissipation of the assets that the Liquidators seek to marshal and that the Newton Plaintiffs also seek through the Newton Proceedings.

For reasons stated below, the Liquidators' motion is DENIED.

## II. BACKGROUND

Unless otherwise stated, the facts described herein are drawn from the parties' docketed submissions. The Court conducted an evidentiary hearing on May 12, 2026, while also considering oral arguments, but the facts that the Court considers material are largely uncontested (with exceptions discussed below) and the parties' main factual dispute took the form of competing expert testimony that is also discussed below to the extent relevant to the Court's decision. This decision resolves the dispute about the applicability of the automatic stay and related relief under sections 1520 and 1521, as well as under section 105 of the Bankruptcy Code.

Multichain Foundation Ltd., a company incorporated in Singapore, operated a software protocol that facilitated the transfer of digital assets across different blockchain networks. The cross-chain transfer protocol called the "Bridge" allowed users to exchange a U.S. dollar-backed stablecoin known as USDC that was on the Ethereum blockchain for a "wrapped" version of the digital asset on other blockchains such as Moonriver and Fantom – an exchange that would not be possible without Multichain's service or some other service that made inter-blockchain transfers possible. A "stablecoin" is a type of cryptocurrency asset that is backed by U.S.-denominated cash or equivalents, so as to promote the relative stability of the cryptocurrency's value.

Under Multichain's system, the wrapped version of a USDC is called a Multi-USDC. The USDC stablecoin at issue was issued by Circle Internet Financial LLC and is considered a stablecoin because for every USDC unit, Circle holds one U.S. dollar in a reserve account.

At relevant times preceding the hack, Multichain maintained a website that described its product and/or services to the public. According to Multichain's statements regarding its

services, its exchange platform was powered by self-executing smart contracts which caused a USDC to be transferred from Ethereum to an External Owned Account ("EOA"), where the USDC was to be held. Access to the EOA was controlled by a key generated by a Multi-party Computation Nodes network system ("MPC Nodes"). The MPC Nodes system supposedly provided a particularly secure system because instead of having a master private key stored in one server and entrusted to an individual or entity, which would allow assets to be controlled by just one party, each node was to generate a different key shard which forms a new operable key only when all the shards are put together. The resulting combined key was then to be used to authorize the EOA either to issue a multi-USDC on a different blockchain such as Moonriver, or to convert a multi-USDC back to USDC on the Ethereum blockchain.

In July 2023, hackers stole digital assets that included $63 million worth of USDC from the Multichain platform. *See Declaration of Bob Yap Cheng Ghee in Support of First Day Documents* ("Ghee Decl.") ¶ 15 [ECF No. 4]. The parties disagree and advance competing theories about how this happened, and responsibility has not been conclusively established. Although the specific mechanism by which the hackers infiltrated the system cannot be proven, the testimonies of both parties' experts lead to the conclusion that the hack could have occurred in either of two ways. First, it is possible that the MPC Nodes were not actually decentralized in the way that Multichain's promotional and public statements described and instead were in fact hosted on a single server and also controlled by one single entity. Second and in the alternative, it is possible that the MPC Nodes were indeed decentralized but were compromised, causing the system to generate the key and improperly authorize the transfer of assets to hacker addresses without following the protocol's usual means of verifying that the requesting party is entitled to the assets.

The former possibility is favored by Multichain's liquidators based on a post on the company's account on social media platform X.com, which they contend discloses that "the MPC Nodes were centrally controlled by Multichain through the Multichain CEO …." *See Motion to Stay the Newton Proceedings* [ECF No. 27 at 9]. They further assert that in the post, "Multichain indicated that all of the MPC Nodes were hosted on the Multichain CEO's personal cloud server and were under his control" and that the CEO's sister "was able to transfer user assets from the Multichain Bridge Software [post-hack] to addresses she controlled in order to preserve those assets. This of course means that she was able to exercise control over the Multichain Bridge Software and to transfer assets from the Multichain Bridge Software to external blockchain addresses." *Id.* at 9-10. As discussed below, the Multichain liquidators further contend as a matter of law that this scenario, if true, would establish a degree of control over the assets by Multichain that they argue would suffice to make the assets property or a right in property of the estate, such that the automatic stay attaches, thus supporting the liquidators' position that the Newton Proceedings are or must be stayed. The Newton Plaintiffs, meanwhile, emphasize that Multichain's own description of its system disavows any possibility of ownership or control of the assets at issue; the Newton Plaintiffs further contend that there is no competent evidence establishing any ownership or control of the assets at any time by Multichain.

In early 2025, an alleged creditor of Multichain commenced an involuntary liquidation process in Singapore, and the Singaporean court entered an order providing for the liquidation of the company and appointing official liquidators to oversee the process. [Ghee Decl. ¶¶ 16-17]. In July 2025, the Newton Plaintiffs, who allege they are rightful owners of the hacked USDC, filed a putative class action lawsuit against Circle seeking to recover funds or cash equivalents allegedly held in Circle's reserve account. At least one theory of the case is that those funds were

held by Circle in constructive trust for the benefit of owners of the blocked or misappropriated USDC, as part of which the Plaintiffs argue it would be inequitable to let Circle keep the assets indefinitely while the rightful USDC owners are unable to recover their assets due to the hack. The Newton Plaintiffs' lawsuit did not name Multichain as a party and did not seek any USDC or other asset that was held by Multichain.

In October 2025, Multichain's Singapore court-appointed Liquidators filed a Chapter 15 petition in this Court, seeking recognition of the Singaporean proceedings and an order staying the lawsuit that the Newton Plaintiffs had brought in the District Court for this District seeking to obtain the U.S. cash or cash equivalents that backed the stolen USDC assets, and that allegedly was currently held in Circle's reserve account. The Newton Plaintiffs filed a limited objection to the Foreign Representatives' motion in this Court, arguing that the Newton Proceedings do not concern or affect Multichain's property, and that the Newton Proceedings thus are not subject to the automatic stay and should not be stayed for any reason.

The parties agreed to the entry of an order recognizing the foreign proceeding and deferring the issue of whether the Newton Proceedings are subject to the automatic stay or should otherwise be stayed. In accordance with an agreed upon briefing schedule, Multichain filed a Motion to Stay the Newton Proceedings (the "Motion") [ECF No. 27]. As the Foreign Representatives confirmed on the record, to the extent their argument arises under section 1520 of the Bankruptcy Code, the relief sought is accurately stated as being a request for a declaration or other determination that the automatic stay that took effect by operation of law upon this Court's recognition of the Singaporean insolvency proceedings applies to, and thus stays, the Newton Proceedings. *See* Hr'g Tr. at 10:1-8 [ECF No. 46]. The Newton Plaintiffs filed an objection (the "**Objection**") [ECF No. 30] and Multichain filed a reply (the "**Reply**") [ECF No.

36]. The parties also submitted numerous sworn declarations [ECF Nos. 28, 31, 32, 37, 38, 43]. On May 12, 2026, this Court heard oral argument and conducted an evidentiary hearing (the "**Hearing**"), during which the only live witnesses were two experts, Andreas Freund on behalf of the Multichain Liquidators and James Miller on behalf of the Newton Plaintiffs. *See* Hr'g. Tr. 71:6 – 84:11; 85:11 – 108:17.

## III. LEGAL STANDARD

The Bankruptcy Code makes the automatic stay that arises by operation of law upon the filing of new bankruptcy cases applicable upon a U.S. court's recognition under Bankruptcy Code Chapter 15 of insolvency proceedings that are pending abroad. Specifically, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding — (1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." 11 U.S.C. § 1520(a)(1).

Additional relief is available to foreign representatives pursuant to Section 1521 of the Bankruptcy Code, which provides that "[u]pon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a)." 11 U.S.C. § 1521(a)(1).

Relatedly, the Code defines property of the estate as "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

To the extent resolution of the motion requires fact-finding, notwithstanding the parties' agreement as to most material facts, the burden of proof rests on the movant, in this case Multichain's Foreign Representatives. *See, e.g.*, *TMT Procurement Corp v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 (5th Cir. 2014); Hrg. Tr. 28:5-17 (Liquidators' counsel acknowledging Liquidators bear burden of establishing the "existence of a property interest of the estate").

## IV. DISCUSSION

### A. The Liquidators Have Not Established That the Automatic Stay Applies to the Newton Proceedings (Section 1520)

#### 1. Applicability of the Automatic Stay

"Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay, applicable to all entities, of most actions against the debtor, the debtor's property, and property of the bankruptcy estate." *In re Maria Granville*, No. 26-11455 (JPM), 2026 WL 2671370, at *3 (Bankr. S.D.N.Y. Sept. 10, 2026) (internal quotations and citations omitted). Among other things, the automatic stay precludes "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor . . . or to recover a claim against the debtor that arose before the commencement of the case," and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1) & (3).

Section 1520 provides that, upon recognition of a foreign main insolvency proceeding, a foreign debtor is accorded legal protections including the application of the automatic stay with respect to the debtor and its property pursuant to section 362 of the Code. 11 U.S.C. § 1520.

As stated earlier, this Court granted Multichain's Foreign Representatives' request for recognition of the Singaporean proceedings. Multichain contends that the resulting automatic

stay operates to proscribe the continuation of the Newton Proceedings because the funds held in Circle's reserve account constitute property or rights in property that belong to the debtor. On the other hand, the Newton Plaintiffs contend that they and not Multichain are the rightful owners of the USDC and Multi-USDC, and that Multichain has no interest in the assets at issue in the Newton Plaintiffs' lawsuit against Circle. They emphasize that Multichain's website described Multichain's "bridge" protocol in ways (such as terming Multichain's process "non-custodial") that require the conclusion that Multichain did not have ownership rights to the digital assets. There is no dispute that Multichain's website described a process by which Multichain would neither own nor control the assets that were transferred or bridged using Multichain's proprietary technology and process, although the parties dispute whether the statements in Multichain's website constituted a user agreement and dispute whether Multichain's behavior conformed with those statements.

At bottom, the resolution of the portion of the Foreign Representatives' motion that relies on Section 1520 requires determining whether the Liquidators have established that the Newton Proceedings seek to recover property or rights in property belonging to Multichain.

2. Property of the Estate

As noted above as to the applicable evidentiary burden, "[i]n all events, the party asserting that property comprises property of a bankruptcy estate . . . bears the burden to demonstrate that they held a legal or equitable interest in that property when the case commenced." *In re Coffer*, No. 24-40296-169, 2024 WL 3450865, at *3 (Bankr. E.D. Mo. July 17, 2024) (citing *Seaver v. Klein-Swanson (In re Klein-Swanson)*, 488 B.R. 628, 633 (B.A.P. 8th Cir. 2013)); *see also In re TMT Procurement Corp.*, 764 F.3d at 523 ("The party seeking to include property in the estate bears the burden of showing that the item is property of the

estate.") (internal quotation marks and citation omitted). Counsel for the Liquidators acknowledged that they bear this burden. Hrg. Tr. 28:5-17.

At the outset, the Court pauses to identify the nature of the claims and assets at issue in the Newton Proceedings while expressing no view concerning that case's merits. As the Newton Plaintiffs emphasize, their lawsuit does not name Multichain as a defendant and does not seek to recover any asset that is currently possessed by Multichain, and instead the lawsuit names only Circle, which is concededly a non-debtor, U.S.-based entity. Their action seeks to recover U.S.-denominated funds or cash equivalents held by Circle in the United States, on what the Newton Plaintiffs describe as a constructive trust theory, namely that Circle, which issued USDC subsequently diverted by hackers while in transit using Multichain's portal, holds assets that backed that USDC in constructive trust for the benefit of the rightful owners of that USDC. Circle's other connection to the case is that it has blacklisted certain addresses to prevent hackers or other non-owners from redeeming hacked USDC. Circle imposed this measure voluntarily, and thereafter this Court ordered Circle to maintain that measure.

Detailed review of the parties' positions follows, but, at bottom, the Foreign Representatives have failed to identify any Multichain property interest in the Circle U.S. currency or equivalent reserves that are the subject of the Newton Proceedings. As a result, they have failed to establish that the automatic stay applies to those proceedings.

First, the Foreign Representatives do not point to any concrete evidence of ownership such as a title document or other contractual documents establishing ownership of assets. By contrast, other crypto cases concluding that an exchange owned customers' crypto assets have often depended on a user agreement that specified ownership by the exchange. *See, e.g.*, *In re Celsius Network LLC*, 647 B.R. 631, 640 (Bankr. S.D.N.Y. 2023). In the absence of a definitive

contractual provision, the Court must look for other signs of ownership or, as discussed below, control of the assets in question that might be sufficient to render the funds held by Circle property of the estate.

The Newton Plaintiffs rely heavily on express statements from Multichain's website that describe Multichain's functioning in a way that appears inconsistent with the idea that Multichain took ownership or other control of the USDC that was being "bridged" across blockchains using Multichain's services. The Newton Plaintiffs argue that these representations preclude any possible rights of Multichain and by extension the Foreign Representatives in the assets held by Circle. The Court therefore first examines the Multichain statements on which the Newton Plaintiffs rely to see what light those statements shed on whether Multichain had ownership, custody, and/or control of the USDC held in the EOA. Whether Multichain's statements are or are not dispositive, however, the burden of establishing ownership remains with the Foreign Representatives, and the Court's treatment of this gating question does not resolve the motion.

*a. Statements on Multichain's Website Regarding Multichain's Process Involving USDC*

Multichain's liquidators' request to stay the Newton Proceedings is based on the contention that the stolen USDCs were owned or controlled by Multichain, and that, hence, the $63 million at the center of the Newton Proceedings is Multichain's property or at least assets in which Multichain had a sufficient interest to trigger application of the automatic stay. The Newton Plaintiffs, relying on certain statements on Multichain's website, argue that there was a user agreement in which Multichain disavowed ownership and/or control of the USDCs, and that this purported agreement is fatal to the Liquidators' motion. The Newton Plaintiffs argue that the Singaporean court itself recognized Multichain as having provided a user agreement through

statements that appeared on its website, although the Foreign Representatives respond that the Singaporean court's observation was about different issues and arose in a default context that does not reflect a considered or binding determination.

The Court concludes that Multichain's website did not create a binding user agreement that entirely establishes the non-existence of any ownership or control of relevant assets by Multichain, and that, therefore, the Newton Plaintiffs' arguments based on language that appeared on the Multichain website alone do not require a ruling in the Newton Plaintiffs' favor. Although this conclusion does not control the outcome of this Motion, it is a gating issue that this opinion addresses first.

"To create a binding contract under New York law,[1] the parties must provide a 'manifestation of mutual assent sufficiently definite to assure that [they] are truly in agreement with respect to all material terms." *NRP Holdings LLC v. City of Buffalo,* 916 F.3d 177, 199 (2d Cir. 2019) (quoting *Stonehill Capital Mgmt., LLC v. Bank of the West*, 28 N.Y.3d 439, 448). "[D]efiniteness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do*." Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.,* 93 N.Y.2d 584, 589 (1999) (citation omitted).

Technological advancement and the rise of web-based contracts do not change the applicable principles of contract law. *See Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract"). In our digital age, courts have recognized the different forms (typically "click-through" or "clickwrap" and "browsewrap"

[1] The Newton Plaintiffs rely on contract cases that apply New York law, Opp. 10, and the Liquidators do not argue or suggest that other law applies. The Court therefore need not conduct a conflict-of-law analysis.

agreements) in which an agreement may be presented and ways for users to manifest assent online. In a click-through interface, users are required to click "agree" at the bottom of the page presenting the service terms. Meanwhile, a browsewrap interface does not require express assent, and instead provides that use of the website is considered acceptance of the terms, usually presented in the form of a hyperlink at the bottom of a webpage that typically states that using the website binds the user to the terms of service contained in the hyperlink. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 836 (S.D.N.Y. 2012). Because a browsewrap agreement does not require express consent, courts consider whether a user had actual or constructive reasonable notice of the agreement when determining the validity of the agreement. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). "Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (citation omitted). "Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 30 n.14 (2d Cir. 2002) (internal quotation marks and citations omitted).

Under New York law, an offeree is subject to contract terms even if he does not have actual notice, provided that "he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 115–16 (2d Cir. 2025) (emphasis in original). To determine whether an offeree had inquiry notice, courts examine "whether the term was obvious and whether it was called to the offeree's attention —an analysis that often turns on whether the contract terms were

presented to the offeree in a clear and conspicuous way." *Id.* (internal quotation marks and citations omitted).

In this case, we are undoubtedly not in the click-through universe because Multichain's users were not required to expressly consent (by clicking "I agree") to its service terms.

The language invoked by the Newton Plaintiffs certainly sounds like a disavowal by Multichain of any custodial or possessory role regarding users' USDC, but other considerations counsel hesitation in deeming the statements to constitute a binding user agreement to that effect, and the result of this decision does not require such a determination.

First, there is a not-insubstantial argument that the facts here also do not establish an enforceable browsewrap agreement on the theory that Multichain users did not have reasonable notice of any such agreement. The Newton Plaintiffs do not argue that the purported agreement was a typical click-through or browsewrap agreement. Rather, they point to the use of specific terms on the website such as "non-custodial" and "decentralized and trustless service" as evidence of an agreement where Multichain disavows control, custody and ownership of the digital assets held in the EOA. However, those terms were not clearly presented as part of a specifically identified user agreement or terms of service. Instead, they were scattered across the website in sections a user need not read or engage with, often primarily focused on questions (such as security assurances) that are not identical with the question of asset ownership. For example, "non-custodial" is used in the website's Frequently Asked Questions (FAQ) section as follows:

> Question: What measures does Multichain take to make sure the security of its system?
>
> Answer: Non-custodial + MPC model technically guarantees the security of crypto assets.

*See Declaration of Tara Q. Higgins* ("Higgins Decl.") Ex. 3 [ECF No. 32]

The FAQ section of a website is not an obvious or intuitive placement for service terms and conditions or a user agreement, nor have the Newton Plaintiffs cited any authority deeming statements in a website FAQ section or other comparably non-obvious place to give rise to a binding user agreement. Users were not required to read the FAQ section before accessing Multichain's platform. Additionally, in the "How it Works" section, Multichain describes its system as a "decentralized and trustless service." [Higgins Decl. Ex. 4]. But this section, like a FAQ section, is not an obvious placement for a user agreement. The Newton Plaintiffs identify no authority recognizing comparably placed statements to give rise to an agreement, and, at any rate, explaining that a service is "decentralized and trustless" does not necessarily answer who owns the assets that are involved in Multichain's services. Meanwhile, the website included no clear heading such as "Terms and Conditions," "User Agreement" or "Legal Policy" indicating a set of terms of service that could potentially bind users of the platform.

Accordingly, there at least is a serious argument that the statements on which the Newton Plaintiffs rely should not be treated the same as agreement terms that were presented in a clear and conspicuous manner, *i.e.*, that they do not constitute an enforceable user agreement. *Compare Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) (finding that notice of contract terms was insufficient where the terms were hyperlinked on a screen with a "Add Phone Number" header, and users were not bound by the agreement even though they clicked "I agree"); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (finding browsewrap agreement was unenforceable where the hyperlink to "[t]he Terms of Use is inconspicuous, buried in the middle to bottom of every [] webpage among many other links, and the website never directs a user to the Terms of Use."), *with Macioce v. Hisense*

*USA Corp.*, No. 25 CIV. 1608 (PAE), 2025 WL 3685179, at *10 (S.D.N.Y. Dec. 19, 2025), *motion to certify appeal denied,* No. 25 CIV. 1608 (PAE), 2026 WL 1802219 (S.D.N.Y. June 23, 2026) (enforcing terms with arbitration provision where the hyperlinked terms were prominently positioned "immediately above the yellow button that [user] was required to click to place his order."); *In re Celsius Network LLC*, 647 B.R. at 653 (finding enforceable agreement where users affirmatively consented to "Terms of Use"); *Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197–98 (2d Cir. 2015) (finding that multiple emails stating that users "must agree" to the hyperlinked terms and conditions provided sufficient notice. "[A] capitalized, bolded heading "**TERMS AND CONDITIONS**" heralded one of these statements") (emphasis in original).

The Court also is not persuaded that the website's statements in question conclusively establish a lack of ownership interest on the part of Multichain. *See* Objection at 15. The Newton Plaintiffs' reliance on *Belsito Commc'ns, Inc., v. Dell, Inc.,* No. 12-CV-6255 CS, 2013 WL 4860585, at *5 (S.D.N.Y. Sept. 12, 2013) is misguided. There, Dell's typical monthly billing statement to the plaintiff included a paper solicitation offering financing options for the purchase of certain products. After calling a Dell representative to confirm the solicitation terms (no payments for the first six months after the purchase), plaintiff bought a laptop. In the motion to dismiss context, the court held that the plaintiff had plausibly alleged that the parties modified the original agreement to incorporate the terms of the paper solicitation. *Id.* ("Plaintiff confirmed that the offer was valid with a representative of Dell, Inc. and accepted the offer by purchasing the laptop"). The other case that the Newton Plaintiffs cite is also inapposite. In *Slainte Invs. Ltd. P'ship v. Jeffrey,* 142 F. Supp. 3d 239, 250 (D. Conn. 2015), an investment fund sued defendant for damages in connection with an investment pyramid scheme. There, Defendant targeted Plaintiff with solicitations but Plaintiff was not satisfied with oral presentations and asked for

written materials. Defendant subsequently provided a private placement memo and later a Stock Purchase Agreement, which included false representations. Plaintiff ultimately made multiple investments based on Defendant's multiple false representations. The court held that "Plaintiff has sufficiently alleged a contractual relationship between itself and the Defendant with respect to the oral and written agreements surrounding Plaintiff's investments." *Id.* The court added that it came "to this holding in light of its limited role at the pleading stage, and notes that Plaintiff will ultimately have to establish the existence of these contractual obligations." *Id.*

The facts in *Belsito and Slainte* are materially distinguishable from the facts here because those cases involved solicitations that were directly targeted at the offeree and linked to a request to make a purchase, at least strongly suggesting on the stated terms and conditions. As *Belsito* explained, "an advertisement generally does not constitute an offer creating the power of acceptance in the offeree" except where "the advertisement is sufficiently clear, definite, and explicit so as to leave nothing open for negotiation." *Belsito Commc'ns, Inc.* 2013 WL 4860585, at *5 (citing *Leonard v. PepsiCo, Inc.,* 88 F. Supp. 2d 116, 122–24 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 88 (2d Cir. 2000) (per curiam)). But a targeted solicitation differs from mere generalized promotional statements. And here, the statements that the Newton Plaintiffs identify do not sufficiently, in a clear and explicit manner, address the transfer (or non-transfer) of title or ownership interest in the stablecoins, which is a material term and is at the center of this dispute; the statements merely describe a technique to achieve token transfers without the sort of centralized control that would introduce one type of security risk.

It may be important to emphasize one thing here. The point of the Court's discussion is that the Newton Plaintiffs have not established that a binding user agreement existed and precluded any possibility that Multichain might somehow have had sufficient control or

possession of the USDC to trigger application of the automatic stay. At the same time, however, it is clear to the Court that nothing has been identified on the website that would give any Multichain customer any understanding or expectation that Multichain was taking title to the customer's USDC while that customer employed Multichain's "Bridge" protocol. The Court's rejection of the idea that the website dictates an outcome for the Newton Plaintiffs should not be mistaken for a conclusion that anything on the website actively favors the Liquidators' contentions regarding ownership or control of the USDC or the assets that Circle now holds.

For these reasons, the Court does not adopt the Newton Plaintiffs' contention that there was a dispositive user agreement between Multichain and the Bridge platform users that conclusively establishes that Multichain lacked ownership or control of assets that were being transferred using Multichain's services.

*b. Multichain Has Not Shown It Had Ownership, Custody, or Control of the USDCs or the Circle Assets at Issue in the Newton Proceedings*

The Court next examines whether the Foreign Representatives have presented evidence that meets their burden to establish that Multichain had ownership, custody and/or control of the USDCs and/or the assets at issue in the Newton Proceedings. Again, this is a question on which the Foreign Representatives bear the burden of proof. The Court applies a preponderance-of-evidence standard in the absence of any argument that some other standard applies.

At the outset, no party has pointed to any evidence tending to show that Multichain assumed any traditional ownership interest of assets being transferred using Multichain's process. And no one has contended that Multichain simply owned the assets. The Court therefore focuses on whether the evidence presented establishes that Multichain had sufficient custody or control of the assets to make the automatic stay applicable. Again, the automatic stay (made

applicable here by section 1520) applies by operation of law to bar several things that the Newton Proceedings definitely are not – such as "the commencement or continuation . . . of a[n] . . . action or proceeding against the debtor" or "a claim against the debtor," so the Court focuses here on whether the Newton Proceedings are an "act to obtain possession of property of the estate or . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(1) & (3). And "property of the estate" is defined as "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

The parties agree that, as a general matter, custody and control of a digital asset is sufficient to create a property interest that can be subject to the automatic stay. However, the Newton Plaintiffs contend that Multichain did not have custody or control over the assets. The Court concludes that the Foreign Representatives have not established the existence of any such custody or control sufficient to trigger applicability of the automatic stay.

As explained above, according to Multichain's own public descriptions, the Bridge platform was run by self-executing smart contracts which cause a USDC deposited on Ethereum (the source chain) to be held in an EOA while a wrapped version is issued on a chosen destination chain, for example Moonriver. The EOA is accessed using a key that is produced by piecing together different key shards generated by the multiple nodes in the MPC nodes system. Multichain's liquidators argue that the fact that the MPC Node system was never audited and the asserted fact that an individual (supposedly a relative of Multichain's CEO) was able to move funds from the EOA after the hack evidence Multichain's control over the assets.

The relevant facts are as follows. Days after the July 2025 hack, a post on the company's X.com (formerly Twitter) account undisputedly stated that the CEO's sister had transferred the

assets remaining in the EOA to two different blockchain addresses as an "asset preservation action" and that the MPC nodes server were all hosted on the CEO's personal cloud server.

Because it is an out of court statement that is offered for the truth of the matter asserted, this social media post constitutes hearsay. Although their applicability here is questionable, there are circumstances where consideration of the post would be proper because "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). The Liquidators have not presented law showing that this exception applies to applications for a declaration or determination on a non-preliminary basis, which their request for relief under section 1520 appears to be. Meanwhile, their request for an injunction under section 1521(a)(1) and/or 105 is not termed "preliminary."

Even if one were to set this impediment aside, there are several reasons not to rely as heavily on the X.com posting as the Foreign Representatives propose. First, its authorship is unknown, and it could plausibly have been posted by hackers or other malign actors; no Multichain personnel or other knowledgeable person is available to address, prove, or disprove this possibility (nor even to authenticate or provide other background regarding the post). Further, although the X.com post provides information that is consistent with the information that is available on public blockchain records, the post does not provide information about how the hack occurred. Rather, the post, if true, confirms that unauthorized transfers were made by hackers (allegedly by the sister of Multichain's CEO), but the post does not shed light on whether the latter transfer was made using a private key that was secretly held by Multichain, as opposed to by virtue of a compromise of the MPC Nodes structure. Second, both sides' experts

agree that hosting some or all of the nodes on the same server poses a security risk because, depending on the cloud configuration, the host of the server could possibly have access to the nodes and cause them to generate a key without a triggering event. *See* Hr'g Tr. 103:9-21; *See Declaration of Andreas Freund* ¶ 9 [ECF No. 28]. However, even if the court credits the social media post's claim that the nodes were all hosted on the CEO's personal server, the Liquidators have presented no persuasive evidence that the host had full access to the key. To reach the conclusion that Multichain possessed a complete private key and could unilaterally authorize transfers, the Court would have to make several insufficiently supported inferences, one atop the other, and the Liquidators have not supplied evidence to support these inferences.

The Newton Plaintiffs point to *Risley v. Universal Navigation Inc.*, No. 23-1340-CV, 2025 WL 615185, at *1 (2d Cir. Feb. 26, 2025) as supporting the conclusion that title was not transferred to Multichain. At issue in *Risley* was whether the developers of a program that facilitated the transfer of cryptocurrency on a decentralized exchange program may be liable under securities laws for alleged fraudulent conduct of third parties on the platform. To answer that question, the court carefully examined the workings of the exchange platform. As the court explained it:

> [The platform is operated] through a system of "smart contracts," which Plaintiffs allege are self-executing and self-enforcing computer programs that autonomously write the terms of an agreement between the traders of a certain cryptocurrency token into the program's code . . . The smart contracts allow the Protocol to operate as a decentralized exchange. Specifically, users on the Protocol trade tokens through token swaps. The smart contracts perform token swaps through "liquidity pools," where users are matched in a peer-to-peer system. When one token is traded for another in a liquidity pool, the smart contract automatically determines the relative prices of the tokens, sets the rate for the exchange, and facilitates the trade if approved by the user.

*Risley v. Universal Navigation Inc.*, No. 23-1340-CV, 2025 WL 615185, at *2 (2d Cir. Feb. 26, 2025). *Risley* concluded that the "smart contract" system as described did not result in token ownership by the operator of the platform. *Id.* at *3.

Multichain's liquidators seek to distinguish *Risley*, noting that "the liquidity pools on the platform were independently created by users without any interaction with the platform host and without any control over those liquidity pools on the part of the platform host." Motion at 19. Multichain's liquidators further argue that Multichain was not decentralized in practice which further differentiates it from *Risley* where the court "found that the liquidity pools at issue were decentralized and not under the control of the platform host or any other party—facts core to the court's observation regarding title to the assets deposited into the liquidity pool." *Id.* at 20.

In the Court's view, Multichain's liquidators fail to come to terms with the significant similarities between Multichain's as-designed and described platform and the *Risley* platform. Both companies represented that they developed platforms designed to be run by self-executing smart contracts, and to allow users to exchange assets on a decentralized system. Further, despite Multichain's liquidators' argument to the contrary, they have not presented any competent evidence tending to show that the Bridge platform actually was centralized notwithstanding Multichain's own description of it as non-custodial and decentralized. As already discussed, both parties' experts could not definitively conclude that some or all of the nodes were hosted on a single server and/or that they were centrally controlled by Multichain. Thus, as in *Risley* and for the same reasons discussed in that decision, the Liquidators have not established that Multichain's role was anything more than that of a non-possessory platform host. Accordingly, the Court cannot conclude that the Liquidators have met their burden to establish that Multichain had custody of or exercised control over the digital assets in the EOA.

There remains some question in the Court's mind whether the assets at issue in the Newton Proceedings – namely, U.S. denominated currency or equivalents that backed USDC assets that ultimately were hacked – would necessarily be property in which Multichain had an interest even if Multichain did possess or control the USDC itself. The Liquidators rely on the answer to that question being yes, but they do not adequately show or explain why this is so. As this Court understands their claims, the Newton Plaintiffs do not seek to recover the USDC itself, and Circle does not possess or own the USDC, although it has blocked certain addresses from making redemptions. The Newton Plaintiffs contend that they are victims of a heist who are the rightful owners of the USDC that is backed by other assets held by Circle, and that they, by extension, have a greater claim of entitlement to the Circle-held U.S. currency or equivalents than does Circle. Even if Multichain did have a degree of control of the USDC that was hacked, which the foreign representatives have not established, it remains unclear to the Court why that would translate to an ownership interest on the part of Multichain in the assets that Circle holds, which, again, are the actual subject of the Newton Proceedings.

Finally, it may be instructive to consider what the opposite outcome would require. The Court has devoted considerable time to this matter and, because proving or holding an absolute negative is difficult (*i.e.*, that Multichain had no ownership or control giving rise to some sort of property interest), the Court has strained to articulate what such an interest on the part of Multichain might have been. The Court acknowledges that the Liquidators are impeded by a lack of cooperation or support from key players, but the Court simply cannot articulate a way based on the available facts in which Multichain had any ownership, possessory, or other interest in anything at issue in the Newton Plaintiffs' litigation against Circle.

Therefore, the Court finds that the Foreign Representatives have failed to meet their burden of establishing that Multichain has or holds an ownership or other interest in the assets that are the subject of the Newton Proceedings. As a result, the Court denies the Liquidators' request for an order determining that the automatic stay applies to the Newton Proceedings.

**B. Relief Under Section 1521 Is Not Appropriate**

Multichain's liquidators alternatively seek the stay of the Newton Proceedings pursuant to some combination of sections 1521 and/or 105(a) of the Bankruptcy Code.

Section 1521 empowers a bankruptcy court to "grant any appropriate relief, including—(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a)." 11 U.S.C. § 1521(a)(1). Relief under Section 1521 is subject to Section 1522(a), which permits § 1521 relief only "if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §1522(a).

Case law addressing the application of Section 1521(a)(1) is sparse, and there is no uniform standard or test that courts apply when determining whether to grant relief under the section. The Collier's treatise, invoking scholarly commentary, views the provision's use of the word "concerning" as "indicat[ing] that a stay of actions against someone other than the debtor or the debtor's assets is a possibility," such as "a stay of litigation against a third party with indemnification rights against the debtor, or with shared liability . . . on the theory that the litigation so stayed concerns the debtor's rights, obligations or liabilities." *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1058–59 n.29 (5th Cir. 2012) (citing to 1 Collier on Bankruptcy ¶ 13.07[2] & n.37 (16th ed. 2012) (emphasis in original)). Two cases that touch on the application of section

1521(a)(1) are *In re Qimonda AG*, 482 B.R. 879 (Bankr. E.D. Va. 2012), and *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031 (5th Cir. 2012).

In *Qimonda*, the court held that a lawsuit against the debtor for prepetition breach of contract violated the automatic stay under Section 362(a)(1). *In re Qimonda AG*, 482 B.R. 879, 883, 890 (Bankr. E.D. Va. 2012). The court also held, without much explanation, that to the extent that Section 362 did not apply, the action was alternatively stayed under Section 1521(a)(1). *Id.* at 890. Additionally, the court enjoined the plaintiff from seeking relief that sought to enjoin the debtor from "selling or licensing any intellectual property" co-owned by the parties because such a relief would seek to exercise control over the debtor's property in violation of Section 362(a)(3). *Id.* at 893. The court held that to the extent that Section 362(a)(3) does not apply, because of the use of the term "estate" (an issue that has not been raised or considered in the case before this Court), the action can alternatively be enjoined pursuant to Section 1521(a)(1). *Id.* The *Qimonda* court explained that an estate is not created upon recognition of a foreign main proceeding because Section 541[2] is not one of the sections that become operative upon recognition pursuant to 1520. *Id.* at 887. Thus, sections of the Code that use the term "estate" might not be applicable to a Chapter 15 debtor – again, an issue that has not been raised or considered here, with the result that this decision assumes that statutory references to acts against an estate that are subject to the automatic stay are applicable here. *Id.* at 887–88 For example, sections 362(a)(3) and 362(a)(4) both reference acts against the estate. Nonetheless, the court concluded that "[f]ortunately, sections 1521(a)(1) and (2) are available to fill in the gaps." *Id.* at 888. Importantly, the court declined to extend the stay to a non-debtor

[2] Section 541 of the Bankruptcy Code governs the creation of an estate.

subsidiary because generally the stay does not apply to non-debtors and there were no unusual circumstances to justify extending the stay. *Id.* at 893.

In *Vitro*, the Fifth Circuit refused to apply section 1521(a)(1) to permanently enjoin actions against a debtor's subsidiaries or to discharge the obligations and liabilities owed by the subsidiaries, rejecting "the bankruptcy court's suggestion to treat the assets of [debtor's] subsidiaries as [debtor's] 'assets' for this purpose." *Vitro*, 701 F.3d at 1058–59.

Applying the terms of section 1521, the Court's determination that the USDCs and in turn the funds at issue in the Newton Proceedings have not been shown to be Multichain's property rules out the possibility of holding that the Newton Proceedings concern Multichain's "assets" or, seemingly, Multichain's "rights" (none of which have been identified by the Foreign Representatives as implicated here). The Court therefore focuses on whether the Newton Proceedings concern Multichain's "obligations or liabilities."

The "potential obligation" that Multichain's liquidators have identified is amounts that Multichain potentially owes to USDC/Multi-USDC holders whose assets became inaccessible due to the hack, all of whom may also fall within the proposed class being advanced in the Newton Proceedings, although no class has yet been certified. But the Newton Proceedings seek to recover reserve funds from Circle, not from Multichain, and Multichain is not even a party to the Newton Proceedings, so the Foreign Representatives have not identified any direct economic impact that Multichain would experience as a result of the outcome of the Newton Proceedings.

Rather, the Newton Plaintiffs are seeking an alternative source to at least partially cover losses they sustained due to the hack of Multichain. This can be analogized to a tort or contract-breach plaintiff seeking to mitigate damages by recovering in whole or in part from a party other than the primarily liable party. The Liquidators have not persuasively shown or explained how

such an effort is one "concerning" the "obligations or liabilities" of the primarily liable party (meaning Multichain and ignoring the liability of the unknown hackers) even though that party's liability might be reduced to the extent the victims' mitigation effort succeeds.

The Foreign Representatives emphasize the importance of comity in this Court's exercise of its Chapter 15 authority, and argue that this important consideration warrants staying the Newton Proceedings so that the Singaporean courts can determine whether Circle's assets should be recovered and administered by the Multichain estate. But, as discussed above, the Foreign Representatives have not established that Multichain has ownership rights or any other direct stake in the funds at issue. Thus, the Foreign Representatives' request in substance is a request to curtail the use of or pursuit by non-debtor parties of non-debtor property, without any direct impact on any asset that has been shown to be property of the Multichain estate. Comity is critical as a general matter, but it is not a license to take such an extreme step.

Multichain's liquidators accurately cite a group of cases for the proposition that "piecemeal adjudication frustrates the core purpose of chapter 15." Motion at 23. Yet none of these cases grant relief under section 1521(a)(1) and, crucially, all concern the distribution of *debtor's assets,* thus implicating core bankruptcy processes. *See In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr. S.D.N.Y. 2022) (staying a debt enforcement action filed against the debtor); *In re Energy Coal S.P.A.*, 582 B.R. 619, 628 (Bankr. D. Del. 2018) ("[g]ranting an injunction in support of a plan that channels parties to the distribution scheme contained therein and otherwise staying execution against a debtor's assets falls within the relief specifically enumerated in § 1521(a)(7)"); *Victrix S.S. Co., S.A. v. Salen Dry Cargo, A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987) (vacating attachment of funds owned by a foreign debtor).

It would be incongruous to conclude section 1521(a)(1) is so elastic as to permit a bankruptcy court to allow a debtor to take over or restrain non-debtor property in hopes that those funds might be used to compensate claimants against its estate even though the proceedings to be enjoined involve no asset of the estate and involve one set of non-debtors seeking to recover assets from another non-debtor against whom the estate has not identified a direct entitlement or obligation. The Foreign Representatives correctly observe that the court's discretion under section 1521(a) is "exceedingly broad," and necessarily so, but that breadth cannot exceed the meaning of the statutory wording "concerning … liabilities or obligations," which as a matter of plain meaning requires that the lawsuit to be stayed must be about those liabilities or obligations (or, inapplicable here, rights or assets). The permissible flexible and broad reach cannot be fairly or appropriately stretched to justify impeding Multichain clients from seeking to recover assets that back their assets, none of which have been shown ever to have been possessed or owned by Multichain, merely because those assets might in some unspecified way ultimately be sought for use in covering Multichain's obligations. *See In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) ("The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors. . .The exercise of discretion is, however, circumscribed by the Bankruptcy Code.") (citations omitted); *see also In re Olinda Star Ltd.*, 614 B.R. 28, 46 (Bankr. S.D.N.Y. 2020). Moreover, to the extent the Foreign Representatives believe this Court underestimates the impact of the Newton Proceedings or believe they have superior entitlement to the assets that Circle holds, the Foreign Representatives may be able to pursue those assets in the Newton Proceedings. *See* Hr'g Tr. 61:2-7 ("Court: would you object to a motion to intervene in your class action by the Multichain

foreign representatives? Mr. Newman: Without committing myself … I think in theory, I would be open to that.”).

**C. Injunctive Relief Standard**

Even putting aside the Court’s determination that the Newton Proceedings are not properly enjoinable under section 1521(a)(1) because they do not concern Multichain’s “assets,” “rights,” “obligations,” or “liabilities,” Multichain’s liquidators fail to meet the standard for injunctive relief, whether under section 1521(a)(1) or section 105(a) (or both).

Section 1521(e) provides that the “standards, procedures, and limitations applicable to an injunction shall apply to relief under paragraphs (1) … of subsection (a).” 11 U.S.C. § 1521(e). And, subject to voluminous cautionary case law that is not recited herein, section 105(a) broadly authorizes courts to “issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.” 11 U.S.C. § 105(a).

The parties treated this requirement by presenting arguments that applied the standard applicable to preliminary injunctions, under which the movant (here the Liquidators) must establish that “‘[1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.’” *In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 622, 649–50 (Bankr. S.D.N.Y. 2023) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

1. <u>Likelihood of Success on the Merits</u>

Demonstrating a likelihood of success requires a plaintiff to show that “the probability of his prevailing is better than fifty percent.” *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (internal quotation and citation omitted).

Multichain's liquidators contend that this factor is satisfied because the foreign proceeding in Singapore has been recognized by this Court. But recognition of the foreign proceeding has already occurred and is not the application at issue in their injunction motion. To satisfy the likelihood of success element, the Liquidators have to demonstrate a likelihood of success on their current application, which turns on whether Multichain had ownership rights and/or interests in the USDCs or any asset held by Circle, such as the cash or cash equivalents that Circle holds in reserve. *Cf. Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (assessing likelihood of success element by reference to merits of First Amendment claim at issue). This decision earlier concluded that Multichain's liquidators have failed to establish such ownership rights and/or interests, or entitlement to relief under the language of section 1521(a)(1). Thus, the liquidators have not met their burden to show a likelihood of success on the merits of the dispute in which their application arises.

2. Irreparable Harm

The Second Circuit has defined irreparable harm as an "'injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue.'" *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Therefore, "if it appears that the potential harm to the moving party is simply a monetary loss, the potential injury is normally not deemed irreparable and hence does not justify injunctive relief." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) (quotation marks omitted).

A bankruptcy court may issue a preliminary injunction "if the action that the debtor seeks to enjoin 'would embarrass, burden, delay or otherwise impede the reorganization proceedings or

if the stay is necessary to preserve or protect the Debtor's estate and reorganization prospects.'" *In re Homaidan*, 640 B.R. 810, 841 (Bankr. E.D.N.Y. 2022) (quoting *Alert Holdings, Inc. v. Interstate Protective Servs. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992)).

Multichain's liquidators contend that allowing the Newton Proceedings to proceed would result in irreparable harm because it would result in the adjudication or the distribution of assets that they believe Multichain should be entitled to recover and distribute to creditors under the supervision and rulings of the Singaporean court. Again, given this Court's determination that the Liquidators have not demonstrated any ownership right to the USDCs, the contention that the Newton Proceedings would interfere with the fair distribution of Multichain's assets to Multichain's creditors fails. Contrary to the Liquidators' arguments, there is no threatened deprivation of Multichain's assets. Moreover, the Multichain's liquidators do not appear to be precluded from intervening in the Newton Proceedings if they so wish so as to pursue any relief that is tied to that action – whether to assert a superior claim of entitlement to any assets notwithstanding this Court's analysis or to oppose any relief that another party seeks from the District Court.

Thus, the Multichain liquidators have not established that denying their request for injunctive relief will result in irreparable harm.

3. <u>Balance of Harms and Public Interest</u>

Multichain's liquidators have not demonstrated that the balance of harms tips in their favor or that the public interest weighs in favor of granting the requested relief. For reasons explained in detail above, the Newton Proceedings will not cause harm to Multichain's estate or adversely impact the administration and fair distribution of Multichain's assets. To the extent the

Liquidators have concerns, they presumably can appear directly in the Newton Proceedings and/or to seek to extend this Court's still-effective order requiring continuation of Circle's blacklisting of suspected hacker-involved addresses. The Court also agrees with the Newton Plaintiffs that it would be contrary to the public interest to sanction the use of non-debtor assets for the benefit of Multichain's creditors without even linking use of the proceeds to some entitlement to the USDC that the reserves back. Moreover, the Newton Plaintiffs would suffer inconvenience and expense if they were forced to stop litigating against a U.S. party in their chosen U.S. forum and instead litigate in Singapore. Thus, the balance of harms and public interest factors do not weigh in favor of granting injunctive relief.

Multichain's liquidators' reliance on section 105 for injunctive relief also fails. Although, in Chapter 11 cases, the automatic stay ordinarily does not apply to non-debtors, it can be extended to non-debtors, but "'only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.'" *In re Calpine Corp.*, 365 B.R. 401, 408 (S.D.N.Y. 2007) (quoting *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003)). "The examples of immediate adverse effect listed by the court involved (1) a claim against a non-debtor for an obligation for which the debtor was a guarantor, (2) a claim against a debtor's insurer, and (3) actions where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id.* (internal quotations and citation omitted). In such circumstances, courts have relied on section 105(a), which empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of title [11]" 11 U.S.C. § 105(a), to justify enforcing the

stay against non-debtor parties. *See In re NFE Glob. Holding Ltd.*, No. 26-11268 (MG), 2026 WL 2032660, at *13 (Bankr. S.D.N.Y July 14, 2026).

Here, none of the circumstances identified in *Queenie* are present, and, for the reasons already discussed, Multichain's liquidators have not identified a direct adverse economic impact that the outcome of the Newton Proceedings would have on Multichain's estate or the fair administration of its assets. Further, any risk of such harm is tempered by the Liquidators' seeming ability to pursue or oppose relief in the District Court.

Thus, the Court declines to grant the discretionary relief that the foreign representatives seek pursuant to sections 1521(a)(1) and/or 105(a) of the Code

## V. CONCLUSION

For the reasons stated above, the motion to stay the Newton Proceedings is DENIED.

SO ORDERED.

Dated: New York, New York
September 30, 2026

*s/ David S. Jones*
Honorable David S. Jones
United States Bankruptcy Judge